12881

SHIVER v. ATLANTIC COAST LINE R. CO. *ET AL.*

(152 S. E., 717)

532

October, 1927.

*Messrs. Hyde, Mann & Figg, Hagood, Rivers & Young* and *Thos. W. Davis,* for appellants,

*Messrs. Shimel & Rittenberg, Thos. P. Stoney, A. R. McGowan, J. D. E. Meyer,* and *Hamer & Crosland,* for respondent,

April 3, 1930.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

This action for damages, instituted and tried in the Court of Common Pleas for Charleston County, grew out of the death of the plaintiff's intestate, William H. Shiver, who was

killed while engaged in his employment as a brakeman for the defendant railroad company. Originally, the defendants were Atlantic Coast Line Railroad Company and E. B. Rush, a trainmaster, and Samuel T. Seymour, an engineer, in the employ of the railroad company, who were performing their duties in their respective capacities on the train where Shiver was also employed at the time of his death. The result of the first trial was a mistrial.

At the second trial before his Honor, Circuit Judge J. K. Henry, the defendant Rush was unable to be present on account of illness. The plaintiff agreed discontinuance of the case as to him, and, by consent, his testimony at the first trial was introduced on behalf of the other defendants. For the reason that there was no evidence of willfulness, the presiding Judge instructed the jury that their verdict must be limited to actual damages. The trial resulted in a verdict in favor of the plaintiff, and from that verdict and the judgment thereupon entered, the defendants Seymour and the railroad company have appealed.

The complaint charged that the death of Shiver was occasioned through the negligence and willfulness of the defendants in eleven particulars set forth. At the close of all the evidence, however, on motion of counsel for the appellants, five of the specifications of negligence were withdrawn from the consideration of the jury; and at the close of the charge of the presiding Judge another specification of negligence was withdrawn by the respondent. So the specifications of negligence submitted to the jury, five in number, were as follows:

1. "In causing and allowing the said engine to haul an excessive number of cars so great as to make the distance between the engine and the rear of the train too long for a proper and sufficient watch to be kept for employees who had alighted from the train in the performance of their duties and would have to board the same again; all in dis-

regard of the safety of plaintiff's intestate and in violation of the rules of the defendant company."

2. "In failing and omitting to have the roadbed at or about the place where the plaintiff's intestate was killed properly and sufficiently ballasted so as to provide a firm and secure footing for employees who, having alighted from the train in the performance of their duties, found it necessary to board the train again while it was in motion."

3. "In failing and omitting to have any lookout on the said train or on any of the cars between the engine and the caboose thereof, to watch out for the safety of the plaintiff's intestate while he was inspecting the said train."

4. "In failing to stop or to slacken the speed of the said train so as to enable the plaintiff's interstate to safely inspect the said train, and to relieve its strain, and to board the same for the purpose of performing his duties thereon in connection with the operation thereof."

5. "In failing to employ a sufficient number of persons on the said train to look out for the safety of one another to enable the plaintiff's intestate to perform his duties safely."

The eight exceptions of the appellants relate to the refusal of the presiding Judge to grant the defendant's motion for a nonsuit at the close of the plaintiff's evidence, and the refusal to grant their motion for a directed verdict at the close of all the evidence. All these exceptions may well be disposed of together.

While the record shows here and there some minor conflicts in the testimony of the witnesses, they are of no great consequence, and, we think, it is not a matter of much difficulty to make a fair statement of the circumstances surrounding the death of plaintiff's intestate.

In our review of the evidence, we have been guided more by the "Statement of Facts" submitted by the attorneys for the respondent, rather than by that statement on the part of the appellants, for the reason that

we conceive it to be our duty in disposing of the exceptions under consideration to give the respondent the benefit of any and all evidence in the case favorable to the allegations of negligence contained in her complaint.

The plaintiff's intestate, Shiver, about 30 years of age, in good health, was a brakeman in the employ of the defendant railroad company, with about five years' experience in that work, and other experience as a railroad employee. At the time of his death, he was in service on a train engaged in interstate commerce. The train, known as a "tonnage test train," consisting of an engine and 76 cars, 73 of which were loaded with vegetables and 3 cars being empty, left Bennett's Yard, near Charleston, destined for Florence. The length of the train was not unusual, for often engines of the class of that which pulled this train carried as many as 85 cars. The trainmaster, Rush, was on the train with the view of ascertaining the pulling power of the engine, so that in case the tonnage was not heavy enough, he would recommend that more tonnage be added. The engine was pulling a tonnage of around 275 tons more than the maximum tonnage usually given it. The crew consisted of the trainmaster, the engineer, fireman, brakeman, conductor, and flagman, the usual crew, with the exception of the trainmaster, for a freight train of this class. There was no entire inspection of the train between Bennett's Yard and Cades, a distance of approximately 66 miles. When the train passed Kingstree, some 2 miles from the place where Shiver's body was found, a telegraph operator for the railroad company at Kingstree, in handing orders to the crew, noticed a "squealing" about midway the train, which he thought was a brake rigging and this condition should have been corrected if possible. The duty to release the brakes rested upon the brakeman, who usually did so by getting on the ground and pulling a rod near the center of the car, which opens an air valve and which produces a release of the brakes; and to do that it is necessary for the brakeman to get off the mov-

ing train. The evidence does not disclose plainly, however, that Shiver was aware of the brake rigging. From Kingstree, there is an upgrade for a distance of a mile and a half, then there is a dip about three-quarters of a mile downgrade. Shiver's body was found about a quarter of a mile from the bottom of the dip, slightly on the downgrade. Between Kingstree and Cades, Shiver, the engineer, fireman, and trainmaster were riding on the engine; the conductor and flagman were in the caboose. Soon after the train passed Kingstree, and while it was going upgrade, with the engine laboring and pulling hard uphill, Shiver got down from the engine. The plaintiff contends that, in all probability, he left the engine for the purpose of releasing the brakes, but there is no evidence to sustain that theory. One of the crew testified that night was fast coming on, and that Shiver said that he was going back to the caboose for the purpose of getting his lantern. The trainmaster testified that Shiver said, "Tell him (the engineer), not to shut off," which was understood to mean that the engineer was not to reduce speed of the train on account of Shiver having to board it a little later. The evidence shows that the speed was not increased. After he left the engine, he may have discovered something wrong with the brakes. There was testimony to show that the last seen of him by any of the crew was when the fireman saw him, some 30 car lengths from the engine, squatting down in a position to inspect the brakes and running gear. Although the train stopped at Cades, for the purpose of taking on water, the stay there was very brief, and no member of the crew saw Shiver. The conductor inspected about half of the train on one side during that stay. It was the duty of the brakeman to assist in this inspection by examining the train on the opposite side, and the conductor was under the impression that Shiver was performing this duty, although at the time he did not see him. Those riding on the engine thought Shiver was in the caboose; those riding in the caboose thought he was on the engine. He was not

missed until the train reached Florence. When the train-master discovered that Shiver had not reached Florence, he reported the fact that the brakeman was missing to various points along the line of railroad, and particularly to Kingstree, near which place he had left the engine. The operator at Kingstree was a brother-in-law to Shiver.

The morning after Shiver was killed, there was some evidence that near the point where his body was found something had been dragged for a distance of around 50 feet in a northerly direction; at the edge of the crossties on the left-hand side of the track, the side on which Shiver had gotton off the engine, the grass and weeds at the edge of the cross-ties had been pressed forward in a northerly direction, at which point there was also evidence of blood, and near which point Shiver's missing shoe was also found. Along the side of the railroad at the end of the cross-ties was a path about 18 inches wide, put there for the use of the railroad employees. The path was rough in some places, some of the gravel used as ballast having rolled down into it, the path itself being around a foot lower than the bed of the track. Some of these gravel or rock were as large as an apple. In a few places, the presence of these rocks make it somewhat difficult for one to walk the path.

The conductor could have stopped the train from the place where he was standing, but he did not do so, because he was not aware that Shiver had left it. Because of the mist and fog, the conductor could not keep all of the train under observation from the place where he was stationed, which was the proper position for him when the train was moving.

When the news reached Kingstree that Shiver was missing, a search was made for him. His body was found near the place where he had gotten off the train; he was lying on his stomach diagonally right across the path with his head lying to the south, his right foot on the end of a cross-tie, his left foot, with the shoe pulled off, doubled under him, his clothes all buttoned up tight, his watch, pocketbook, and

pass in his pocket, his gloves on, and his cap missing; the cap being afterwards found about 35 feet south of where the body was found, and the shoe being found about 10 feet north of the body.

The train passed Kingstree at 4:55 p. m., and when Shiver's body was examined by a physician about 10 o'clock that night rigor mortis had completely set in, and the physician testified that the average time for the setting in of rigor mortis in a body of a normally healthy person is five hours. The examination showed blood running out of the nose, right ear, and mouth. The face had a "brush wound" over the right eye, the bridge of the nose was lacerated, and there were other injuries. But the evidence showed that Shiver had not been run over by the train. It appears that Shiver did not die instantaneously, but lived long enough to breathe a few times.

When Shiver left the train, it was traveling between 12 and 15 miles an hour, and that speed was not increased for some time, and certainly it was not increased for the distance of the whole length of the train.

Brakemen are accustomed, in the discharge of their duties, to board moving trains, and it is considered safe by experienced railroad men for one to board a train going even 18 miles an hour. In boarding a train, the person seeking to board the same first gets hold of the handhold of the ladder with his hand and draws himself up and catches his feet in the stirrup which is right under the ladder. The speed of a train has a whole lot to do with the way a person in boarding the train must act; the faster the train is going, the quicker it must be done. If the train is moving slowly, it is very easy to board it; but if a train goes fast, he must board it very quickly or his hand will slip loose or his foot slip through the stirrup. One usually boards a train with the right foot, and if that right foot should slip through the stirrup the left foot would naturally be headed for the wheel nearby and would go under or against the wheel, and

after a man was caught with his right foot in the stirrup and his left foot down, his body would be on the ties and his head and the upper part of his body would drag.

No one saw Shiver attempt to board the train, and the manner in which his death occurred must be gathered from the circumstantial evidence adduced at the trial.

It is our opinion that all the witnesses in the case sought honestly to tell the truth. We think that the brakeman, filled with the desire to render honest and faithful service to his employer, left the engine for the purpose of going to the caboose for his lantern. On his way, he thought something was wrong with the brakes, and he squatted to the ground for the purpose of making an inspection. No one, of course, can say that he attempted to release the brakes. The theory of the respondent, and with that we agree, is that Shiver attempted to do, what he had often done before, board the moving train. In some way, he failed to get a secure hold, fell from the moving train, and received the injuries which caused his death.

The evidence showed that under the rules of the company, and under the usual custom, it was the duty of the brakeman to board a moving train in the performance of his work, unless it was too dangerous for him to attempt to do so. When to board the train was too risky, and attended with too much danger, for the safety of the brakeman, it was his duty not to attempt to board, but to refrain from doing so, and to communicate with the crew in some manner his failure to get back on. If necessary, he should even go to the nearest station and report by wire.

The rules of the railroad company, introduced in evidence, some by the respondent and some by the appellants, thought to be applicable to the case, were as follows:

## "Special Rules"

"707. Employees of every grade are warned to see for themselves, before using them, that the machinery or tools

which they are expected to use are in proper condition for
the service required; and if not, to put them in proper condi-
tion, or see that they are so put, before using them. The
Company does not wish, nor expect, its employees to incur
any risk whatever from which, by exercise of their own
judgment and by personal care, they can protect themselves,
but enjoins them to take time in all cases to do their duty in
safety, whether they may, at the time, be acting under orders
of their superiors or otherwise."

"FREIGHT CONDUCTORS"

"845. They are responsible for the safety, prompt move-
ment and proper care of their trains, for the conduct of the
men employed thereon, and for the signals, lamps and tools
entrusted to their care.

"846. They must be familiar with the duties of Engine-
men, Firemen, Flagmen and Brakemen, and enforce the
rules applicable to them upon their trains."

"851. They will see that the couplings and brakes of the
cars in their trains are in good order before starting, and
inspect them as often as possible.

"852. They will station the brakemen at their respective
posts on their trains, and see that they keep their positions
and use the brakes properly, particularly when descending
heavy grades. When backing into side tracks they will see
that hand brakes are applied to prevent the slack running out
and the train parting."

"866. The proper place for a freight train conductor
while his train is in motion is in the cupola of his caboose,
if it has one. If the caboose should not be provided with a
cupola, he will them maintain such position, either on the
top or inside, as will give him a full view of his train and
enable him to see that they go promptly when necessary to
flag. He must also keep a lookout, especially when rounding
curves. He should not ride on the engine except in case of
necessity."

"Rules for Freight Brakemen"

"882. They will report to and receive their instructions from the Train Master. While on the train they are under the direction of the Conductor. At stations they will obey the orders of the Yard Master.

"883. They will attend to the brakes."

"Trainmen"

"1087. Brakes Sticking. If the brakes are found sticking signal Engineman to release them. If the Engineman cannot release them, open the bleed cock in the auxiliary reservoir until the air begins to escape through the triple valve, when the reservoir cock must immediately be closed."

In our consideration of the evidence and the exceptions, we are not to follow the usual rule of this Court that, if there was *any evidence,* however slight it may have been, going to establish the plaintiff's case, it was the duty of the presiding Judge to submit the case to the jury. This case was brought and tried under the Act of Congress known as the Federal Employers' Liability Act (45 USCA §§ 51–59). We are to be governed, therefore, by the federal decisions interpreting that Act.

In the recent case of *Davis, Administrator, v. A. C. L. Railroad Co. et al.,* 150 S. C., 130, 147 S. E., 834, we held, under our rule, that the case should have been submitted to the jury. The Supreme Court of the United States reversed the judgment here, and decided in favor of the railroad company. See *Atlantic C. L. Railroad Co. v. Davis,* 279 U. S., 34, 49 S. Ct., 210, 73 L. Ed., 601. In that case, the Supreme Court of the United States said this: "It is unquestioned that the case is controlled by the Federal Employers' Liability Act, under which it was prosecuted. Hence, if it appears from the record that under the applicable principles of law as interpreted by the Federal Courts, the evidence was not

sufficient in kind or amount to warrant a finding that the negligence of the Railroad Company was the cause of the death, the judgment must be reversed. *Gulf, M. & N. R. Co. v. Wells,* 275 U. S., 455, 457, 72 L. Ed., 370, 371, 48 S. Ct., 151, and cases cited."

A recent case, closely in point on the general questions involved in this case, and on the particular phase involving alleged increase of speed, is the case of *Wimberley v. A. C. L. Railroad Co.,* 190 N. C., 444, 130 S. E., 116. To save time, we will not quote from the facts of that case, contenting ourselves by saying that Chief Justice Stacy of North Carolina Supreme Court-wrote a very strong opinion going to show that it was proper for the case to be submitted to the jury on the question of negligence. But the Supreme Court of the United States thought otherwise, and when the case reached that tribunal, it simply said: "Reversed on the authority of *St. Louis-San Francisco R. Co. v. Mills,* 271 U. S., 344, 70 L. Ed., 979, 46 S. Ct., 520, and *Chicago, M. & St. P. R. Co. v. Coogan,* 271 U. S., 472, 70 L. Ed., 1041, 46 S. Ct., 564." *Atlantic C. L. Railroad Co. v. Wimberley,* 273 U. S., 673, 47 S. Ct., 475, 71 L. Ed., 833.

Under the legal principles announced by the Supreme Court of the United States in the cases to which we have referred, the evidence, as we view it, was insufficient to show any actionable negligence on the part of the defendants, as alleged in the complaint, which brought about the injuries to Shiver and his resulting death. The evidence as to his death, and as to the cause of it, was speculative, and it was not sufficient to show the proximate cause thereof. The only possible negligence, which the plaintiff established, related to the rocks in the path. But, in that connection, the evidence also showed that these rocks could be easily seen by one walking the path even when it was as dark as it was the afternoon when Shiver lost his life; and there is no evidence, circumstantial or otherwise, to show that the condition of the path was the proximate case of the

injuries. The rocks may have bruised, hurt, and even killed Shiver when he fell on them, but it cannot be said that they primarily caused him to fall. Under the evidence, Shiver assumed, as a matter of law, any risk of injury in boarding or alighting from the moving train at the speed the train was traveling. *"The plaintiff cannot recover in the absence of negligence on the part of defendant. Seaboard Air Line R Co. v. Horton,* 233 U. S., 492, 502, 58 L. Ed., 1062, 1069, L. R. A., 1915-C, 1, 34 S. Ct., 635, Ann. Cas., 1915-B, 475. And, except as specified in Section 4 of the Act * * * the employee assumes the ordinary risks of his employment, and, *when obvious or fully known and appreciated by him, the extraordinary risks and those due to negligence of his employer and fellow employees. Boldt v. Pennsylvania R. Co.,* 245 U. S., 441, 445, 62 L. Ed., 385, 389, 38 S. Ct., 139; *Chesapeake & O. R. Co. v. Nixon,* 271 U. S., 218, 70 L. Ed., 914, 46 S. Ct., 495. *If, upon an examination of the record, it is found that as a matter of law the evidence is not sufficient to sustain the essential findings of fact, the judgment will be reversed. Chicago, M. & St. P. R. Co. v. Coogan,* 271 U. S., 472, 474, 70 L. Ed., 1041, 1043, 46 S. Ct., 564." *Toledo, St. L. & W. R. Co. v. Allen,* 276 U. S., 165, 48 S. Ct., 215, 216, 72 L. Ed., 513. (Italics ours.)

The judgment of this Court is that the judgment below be reversed, and as provided in Rule 27 of this Court that a verdict in favor of the defendants be entered up.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES COTHRAN, STABLER and CARTER concur.