**FERNALD v. BOSTON & M. R. R.**
**No. 30.**

Circuit Court of Appeals, Second Circuit.
Jan. 9, 1933.

Martin Gilligan, of New York City (K. O. Mott-Smith, of New York City, of counsel), for appellant.

Alfred T. Rowe, of New York City (Sol Gelb, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUS-TUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff's decedent was a car inspector employed by the defendant railroad company. He met his death in defendant's freight yard at Ayer, Mass. The plaintiff, his widow and the administratrix of his estate, brought this action under the Federal Employers' Liability Act (45 USCA §§ 51–59) to recover damages for his death, alleged to have been caused through the negligence of the railroad. The acts of negligence, relied on, consisted of the disregard of an alleged custom at the freight yard of never shunting cars along a track adjacent to one on which a train was moving out. The defendant insists that no proof was made at the trial of such a custom, and that, if such a custom existed, decedent was not shown to have come within the class of employees for whose benefit it was established.

The occurrences immediately preceding the accident were as follows: A freight train had been made up in the yard and was standing on track 7, with its engine under steam. A switch engine some distance to the east of this freight train was engaged in switching cars westwardly along a so-called "ladder track" into various other tracks in the yard. Five cars were attached to this switch engine that were to be shunted into track 8. Track 8 ran in a direction parallel to track 7 and was directly adjacent to it. These two tracks intersected at their easterly ends at a switch and ran over it into the "ladder track" which extended east of the point of intersection. From this "ladder track" cars might pass westwardly and over the switch to either track 7 or track 8 according to the way in which the switch was set. The engineer of the train on track 7 pumped air into the brake line and then blew a single blast on his whistle to show that he was going to set his brakes and that a "standing" brake test was to be made. At this signal it became the duty of Fernald, the car inspector, to start from the caboose, and go forward along the train to see whether he

could hear any leaks in the brake line. Fernald performed this duty. He was next required to report to the engineer whether there were any leaks. This he also did. According to plaintiff's claim he had the further duty to make what is called a "running inspection" of the brakes after the train started to move, in order to ascertain whether any of the brake shoes were sticking to the wheels. No witness testified that he was actually seen to do this and Crom, a brakeman called on behalf of the defendant, swore, without contradiction, that he himself made the running inspection by walking back from the engine, as the train moved out along track 7 toward the switch, and then climbing into the caboose as it came along. According to plaintiff's testimony, after the standing inspection had been made, the headlight of the engine was put on and the engineer blew two whistles and slowly moved his train eastwardly toward the switch while the running inspection began. At this time the switch between track 7 and the "ladder track" was set against him so that his train could only proceed as far as the switch and not over it on to the "ladder track" and out of the yard. After he had started to move toward the switch the conductor in charge of the five cars, which were then on the "ladder track" to the east of the switch, gave a signal to the switching engine which thereupon proceeded to "kick" them down over the switch, as railroad men say, and shunt them into track 8. As soon as the rear of the five cars had passed to the west of the switch into track 8, one of the yard men threw the switch so that it was no longer set against the train on track 7 and that train was able to continue on across the switch into the "ladder track" and proceed on its way. In the course of the shunting of the five cars into track 8, the foremost car ran over and killed Fernald who was seen by three different witnesses standing between the rails of track 8 with his back to the on-coming cars, apparently making out a report, doubtless of the standing inspection. He had worked for the railroad for about eleven years and was familiar with the freight yard.

■ Switch yard employees are in general held to assume the risk of their employment and in such a place a railroad company is under no duty to warn them of the approach of trains. C. & O. R. Co. v. Mihas, 280 U. S. 102, 50 S. Ct. 42, 74 L. Ed. 207; Toledo, St. L. & W. R. R. Co. v. Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513; Missouri Pac. R. R. v. Aeby, 275 U. S. 426, 48 S. Ct. 177, 72 L. Ed. 351; C. & Ohio Ry. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; Aerkfetz v. Humphreys, 145 U. S. 418, 12 S. Ct. 835, 36 L. Ed. 758.

The plaintiff does not question that the doctrine of assumption of risk would ordinarily bar recovery and relies on the exception to this general rule that the violation of a custom established for the benefit of employees prevents any assumption of risk and constitutes negligence, for the consequences of which the employer is liable. McGovern v. Phila. & Reading R. R., 235 U. S. 389, 35 S. Ct. 127, 59 L. Ed. 283; Pacheco v. New York, N. H. & H. R. Co. (C. C. A.) 15 F.(2d) 467; Lehigh Valley R. Co. v. Doktor (C. C. A.) 290 F. 760; St. Louis & S. F. Ry. Co. v. Jeffries (C. C. A.) 276 F. 73; Director Gen. of Railroads v. Templin (C. C. A.) 268 F. 483.

It is contended on behalf of the plaintiff (1) that there was a custom in the defendant's yard not to shunt cars along a track adjacent to one on which a train had started to move out, (2) that this custom was for the benefit of employees engaged in making an inspection, (3) that Fernald was such an employee.

■ The evidence of the custom was weak. It was contradicted by five witnesses and consisted only of the testimony of plaintiff's witnesses Noonan and Crow, the first of whom had been discharged by the railroad some eleven months before the date of the accident, and the second some two years before. Noonan said that there was a practice prevailing in defendant's yard respecting the movements of the switch engine after a train had started to go out and that then "the switch engine would get in the clear to let the train go over the ladder track." He added that after the train started out it was the practice not to kick any more cars down in the direction of that train. His statements, taken literally, were consistent with the switch being open and he was not asked whether the custom applied to cases like the present where the switch was closed against the train on No. 7 track. The difficulty with not limiting Noonan's testimony regarding custom to cases where the switch was set against a train starting to move out is that there can be no reason for establishing a custom not to shunt cars over an open switch into an on-coming train. Such conduct would involve utter recklessness and flagrant illegality, and no custom was needed to prohibit it.

The testimony of Crow was likewise unsatisfactory. He said that it was not the

practice to kick cars on a track adjacent to one on which a train was moving out and indicated (at folio 410) that a train might be moving outward, even though the switch had not yet been set so as to allow it to go beyond it. Crow also was not confronted with the question whether the alleged custom covered the period before the switch was opened. Like Noonan, he stated the custom in general terms, but it would seem to have had no rational purpose unless applied to cases where shunting was forbidden from the moment a train was starting to move. Defendant argues that this rather vague testimony from two discharged employees, each one of whom spoke of conditions a year or more before the accident, should be given no credence, especially when there were five witnesses who denied that the custom existed and there were two rules of the railroad covering the situation: Rule M, providing that employees "must expect trains to run at any time, on any track, in either direction," and rule 97C that "Extra trains may be run at any time, and trains may run on any track in either direction without notice, except to those whom it is necessary to advise in order to insure proper movement of such trains." We incline to the view that there was sufficient proof for submission to the jury of a custom not to shunt cars along a track adjacent to one on which a train had started to move out even in cases where the switch was still set against it. If we assume that the jury could find that this custom existed, there was testimony showing that it was for the benefit of employees engaged in making an inspection. Some of the witnesses stated that to make an effective running inspection the inspector had to be several feet away from the moving train, and that he ordinarily went over to the next track so as to secure a better angle of vision when looking at the brakes. Only this supposed advantage of inspecting from an adjacent track can justify the alleged custom. Otherwise inspectors could pass between the two trains and very close to the brakes, as they at times apparently did, and would run no more risk in so doing than in any case where cars were being shunted on a track next a train.

[4] But the defendant says that Fernald was not an employee engaged in making a running inspection, and that the running inspection was made by the brakeman Crom. There was evidence, however, that it was the duty of inspectors, rather than brakemen, to make running inspections, and Fernald was seen by three witnesses on track 8 where he might properly have gone to make a running

inspection, if plaintiff's testimony that it was customarily made from an adjacent track is to be believed. To be sure, the witnesses who saw Fernald on track 8 said that he was engaged in making some notes. But, while he was not clearly shown to have been about the business of making a running inspection at that time, it can hardly be held as a matter of law that he was not thus engaged merely because he was taking some notes to make a record of the prior standing inspection, or even for some other purpose. He might at the time have been both inspecting and making notes, or he might have been just about to begin the running inspection. In view of plaintiff's testimony that inspectors make running inspections, and that Fernald was standing where they customarily are stationed for that purpose, we think that there was enough evidence to justify the jury in finding that Fernald met his death while engaged in such an inspection.

The plaintiff's proof was rather unsatisfactory for the reasons we have pointed out, and her case was especially weakened by the omission of the trial judge to submit to the jury the questions whether the custom was for the benefit of employees who were making running inspections and whether Fernald was engaged in that duty when he was killed. He instructed them, in substance, that, if the custom was found to exist, and the violation of it was a direct cause of Fernald's death, the plaintiff was entitled to a verdict. This instruction omitted vital matters.

It is true that no exception was taken to the charge because it failed to leave to the jury the question whether the custom was for the benefit of employees making running inspections and whether Fernald was one of such employees, but the omission was challenged by the defendant when its counsel excepted to the following specific instruction (folio 704):

"Mr. Sansome: * * * Now I ask Your Honor to charge that if the jury find that there was a custom or practice and that the cars were kicked down there in violation of the custom or practice, that then Mr. Fernald did not assume the risk, unless he knew, or with ordinary caution should have known that that custom and practice had been violated."

The jury was allowed to find for the defendant if it found the custom to exist and nothing more. But it had no right to return a verdict for the plaintiff unless he belonged to the class for whose benefit the custom was established, namely, employees en-

gaged in making running inspections, and unless he was about that business at the time of the accident. C. & O. Ry. Co. v. Mihas, 280 U. S. 102, 50 S. Ct. 42, 74 L. Ed. 207; Norfolk & W. Ry. Co. v. Collingsworth (C. C. A.) 52 F.(2d) 827; Reynolds v. New York, O. & W. Ry. Co. (C. C. A.) 42 F. (2d) 164; Norfolk & W. Ry. Co. v. Gesswine (C. C. A.) 144 F. 56.

When the proof of the custom and the proof that Fernald was engaged in making a running inspection were so slight, it certainly was prejudicial error to allow the jury to find a verdict for the plaintiff upon the sole ground that a violation of the custom was sufficient to sustain a recovery. For this error the judgment must be reversed.

Judgment reversed.