### TILLER v. ATLANTIC COAST LINE R. CO.

No. 4909.

Circuit Court of Appeals, Fourth Circuit.
May 19, 1942.

Richmond Moore, Jr., and J. Vaughan Gary, both of Richmond, Va., for appellant.

Collins Denny, Jr., of Richmond, Va., and J. M. Townsend, of Petersburg, Va., for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

John Lewis Tiller, a sergeant of police in the employ of the Atlantic Coast Line Railroad Company, was fatally injured while on duty at 7 P. M. on the evening of March 20, 1940, when he was struck by a railroad car in the Clopton Yard of the Railroad Company near Richmond, Virginia. Upon the trial of the suit by his

executor against the Railroad Company for damages for his death under the Federal Employers' Liability Act of April 22, 1908, as amended by the Act of August 11, 1939, 45 U.S.C.A. § 51, et seq., the District Judge directed a verdict for the defendant upon the ground that the evidence disclosed no negligence on the part of the carrier. The case largely turns on the meaning of the amendment of 1939 whereby § 4 of the Act was changed to add the provision that in any action under the Act to recover damages for the death of an employee, the employee shall not be held to have assumed the risk of his employer's negligence. See 45 U.S.C.A. § 54. It is the contention of the appellant that by reason of this amendment the carrier may no longer rely upon the rule that as employees in railroad yards are aware that cars and engines move in all directions at irregular intervals, they assume the risk and must be on the lookout for their own safety so long as the movement is not unusual.

The defendant carrier operates each evening a freight train from Richmond to the south in two sections. Cars from the north are assembled at the Acca Yard of the Richmond, Fredericksburg & Potomac Railroad, and brought thence by a road engine to the Clopton Yard on the south side of the James River. Richmond cars are assembled at Byrd Street Station of the carrier, on the north side of the river, and are taken thence to the Clopton Yard. These cuts of cars arrive about the same time and are there assembled for further transportation in such order that they may be conveniently dropped off at divers southern points.

Running through the Clopton Yard from east to west is the Clopton Road that is open to the public. Coming from the north of the road are three parallel tracks, of which the easternmost is the northbound main line, the center the southbound main line, and the westernmost is known as the slow siding and is used for shifting operations. Coming in from the northwest are the tracks from the Acca Station which also cross the Clopton Road to the west of the slow siding and connect with it south of the road.

Tiller had been in the employ of the Railroad Company for sixteen years, and was familiar with the layout of the tracks in the Clopton Yard and with the operation of the cars and the make-up of the trains. It was his duty as a member of the police force to guard the merchandise in the trains, to inspect the seals on the cars, and in the performance of his duty he rode the trains at such places as he saw fit. He followed no regular routine in coming to the Yard to police this particular train. He was seen at the Byrd Street Yard before the cars left that point on the night in question, and it is a fair inference that he rode on the cars from Byrd Street to Clopton Yard, although no one saw him on the cars or knew where he rode. He likewise followed no routine in checking the seals on the cars but did this work in various places in the yard.

The assembly or classification of the cars in making up the train requires the shifting of the cars back and forth, and employees, including police officers within the yard, are instructed that they must watch out for the movement of the trains as no employee watches out for them and no lights are used at night on the head end of back-up movements except when an employee is placed at the back end with a lantern to protect a road crossing.

On the night in question, the cars from the Acca Station came into the Clopton Yard from the northwest, and the engineer was instructed to cut off three cars from his train and to go southwardly across the Clopton Road until he reached the slow siding and then to back up on the slow siding northwardly. These movements were made. In the meantime the cars from the Byrd Street Station had come south on the southbound main line. The evidence indicates that Tiller was standing on the slow siding, or between the slow siding and the southbound main track, inspecting the seals on the cars from Byrd Street that were on the southbound main track. He was struck a short distance north of the Clopton Road by the back-up movement of the cars from Acca Station on the slow siding. While no one saw the accident, this account is justified by the finding of Tiller's flashlight a few feet north of the Clopton Road and the finding of his cap and his pistol at intervals a few feet further north, and finally by finding him under the wheels on the east side of the rear end of the head car. The brakeman on the car in the back-up movement was riding on the west side near the end of the head car holding a lantern with which he gave signals to the engineer as they approached the Clopton

Road, but it was his duty to look out for traffic on the Clopton Road and he did not see Tiller standing to the east of the train. The automatic bell on the engine attached to the cars in the back-up movement was ringing at the time.

The distance between the western rail of the south bound main line track and the eastern rail of the slow siding was 7 feet 11½ inches. This distance was reduced by the overhang of the cars moving in opposite directions on the two tracks to 3 feet 7½ inches, so that there was sufficient room for a man to stand in safety between slowly moving cars on the two tracks; but it is probable that Tiller did not hear cars approaching on the slow siding from the south.

There was some evidence on the part of the plaintiff that there was an error in the classification of the cars at Byrd Street, which necessitated the classification at the Clopton Yard. There was also evidence on the part of employees on the cars from the Acca Yard that they had not made this particular movement on prior occasions. But these employees had been on this particular run for only a few times in several years, and the evidence as a whole leaves no doubt that the Clopton Yard is a classification yard and that movement on the slow siding was in no sense unusual. It follows that the case presents no exception to the rule concerning the duty of railroad employees in freight yards to look out for their own safety, and the question for determination is whether this rule has been modified by the amendment of 1939 to the Employers' Liability Act.

Prior to the amendment of § 4 of the Act, it was well settled that carriers had the right in actions under the Act for damages to rely upon the defense that their employees assumed the ordinary risks of their employment. This right was limited only by the provision of § 4 that the employees should not be held to have assumed the risks of their employment in any case where the violation by the carrier of any statute enacted for the safety of the employees contributed to the injury or death of the employee. Specifically it was held that in the movement of cars in a railroad yard by day or by night a carrier was under no duty or obligation to look out for the employees within the yard or warn them of the approach of cars in the ordinary manner by the blowing of whistles, the ringing of bells or the display of lights or otherwise.

Thus, in Toledo, St. L. & W. R. Co. v. Allen, 276 U.S. 165, 168, 169, 170, 171, 48 S.Ct. 215, 216, 72 L.Ed. 513, in the case of a car checker, it was said:

"The plaintiff cannot recover in the absence of negligence on the part of defendant. Seaboard Air Line [Ry.] v. Horton, 233 U.S. 492, 502, 34 S.Ct. 635, 58 L.Ed. 1062, L.R.A.1915C, 1, Ann.Cas.1915B, 475. And, except as specified in section 4 of the act, (45 U.S.C.A. § 54); the employee assumes the ordinary risks of his employment, and, when obvious or fully known and appreciated by him, the extraordinary risks and those due to negligence of his employer and fellow employees. Boldt v. Pennsylvania R. Co., 245 U.S. 441, 445, 38 S.Ct. 139, 62 L.Ed. 385; Chesapeake & Ohio R. Co. v. Nixon, 271 U.S. 218, 46 S.Ct. 495, 70 L.Ed. 914.

" * * * The work of checking cars in a yard at night where switching is being done is necessarily attended by much danger. But fault or negligence may not be inferred from the mere existence of danger or from the fact that plaintiff was struck and injured by the moving car. Defendant did not owe to plaintiff as high a degree of care as that due from carriers to their passengers or others coming on their premises for the transaction of business. The reason for the distinction is that plaintiff's knowledge of the situation and the dangers existing because of the narrow space between the tracks was at least equal to that chargeable against the defendant. Missouri Pacific Railroad Co. v. Aeby, 275 U.S. 426, 48 S.Ct. 177, 72 L.Ed. 351.

" * * * On the evidence it must be held that he knew how switching was done there; and, in the absence of proof that he was exposed to some unusual danger by reason of a departure from the practice generally followed, it cannot be held that defendant was in duty bound to give him warning. The members of the switching crew had a right to believe that he would keep out of the way of the shunted car. Aerkfetz v. Humphreys, supra [145 U.S. 418, 12 S.Ct. 835, 36 L.Ed. 758]."

And in Missouri Pac. R. Co. v. Aeby, 275 U.S. 426, at pages 429, 430, 48 S.Ct. 177, at page 179, 72 L.Ed. 351, in the case of an employee slipping on ice on a station platform, the court said: "Under

the circumstances, it cannot reasonably be held that failure of petitioner to remove the snow and ice violated any duty owed to her. The obligation in respect of station platforms and the like owed by carriers to their passengers or to others coming upon their premises for the transaction of business is greater than that due their employees accustomed to work thereon. The reason is that the latter, familiar with the situation, are deemed voluntarily to take the risk of known conditions and dangers. Tuttle v. Detroit, G. H. & Milwaukee Railway Co., supra [122 U.S. 189], 194, (7 S.Ct. 1166) [30 L.Ed. 1114]. The facts of this case, when taken most favorably to the respondent, are not sufficient to sustain a finding that petitioner failed in any duty owed to her."

To the same effect were Acrkfetz v. Humphreys, 145 U.S. 418, 420, 12 S.Ct. 835, 36 L.Ed. 758; Chesapeake & Ohio R. Co. v. Nixon, 271 U.S. 218, 219, 46 S.Ct. 495, 70 L.Ed. 914; Delaware, etc., R. Co. v. Koske, 279 U.S. 7, 11, 49 S.Ct. 202, 73 L. Ed. 578; Southern R. Co. v. Verelle, 4 Cir., 57 F.2d 1008; Fernald v. Boston & M. R. R., 2 Cir., 62 F.2d 782; Norfolk & Western R. Co. v. Collingsworth, 6 Cir., 32 F.2d 561; Connelley v. Pennsylvania R. Co., 3 Cir., 201 F. 54, 47 L.R.A.,N.S., 867.

These decisions clearly show that liability on the part of the carrier was denied because it was guilty of no neglect in failing to safeguard the injured employee from the ordinary risks of the business; and the reason given was that the employee assumed the risks and in effect agreed to look out for himself. The appellant claims that this situation is now changed by the addition to § 4 of the provision that "such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." The argument is that as the doctrine of the assumption of the risk has been abolished in this respect, the carrier can no longer interpose it as a shield against the consequences of its neglect and hence is liable for injuries to its employees in its railroad yards or elsewhere, unless it takes precautions for their safety commensurate with the danger that they are likely to encounter.

Superficially considered, the argument seems to follow a logical sequence;

but it loses its force when the true nature of the doctrine is understood. It is necessary to bear in mind that the phrase "assumption of the risk" is used in more than one sense and that it is not true to say, as the appellant's argument implies, that in every case where the doctrine was formerly applicable, there was negligence on the part of the employer. The truth is that there may be assumption of the risk by an employee without negligence either on his part or on the part of his employer. At common law a master was not responsible to his servant for injuries which did not flow from the master's neglect but were inherent in the nature of the business. The risk of these dangers the employee assumed, and it was in this sense that the phrase was originally used. So it was said in the quotation from Missouri Pacific R. Co. v. Aeby, 275 U.S. 426, 429, 430, 48 S.Ct. 177, 179, 72 L.Ed. 351, above set out, in explaining the greater obligation owed by a railroad carrier to its passengers than to its employees, "the reason is that the latter, familiar with the situation, are deemed voluntarily to take the risk of known conditions and dangers."

But there is another sense in which an employee is said to assume the risk, that is, when he has knowledge that his safety is endangered by some neglect on the part of his employer and nevertheless continues to work without complaint and without promise of repair or remedy. Not long after the Employers' Liability Act was passed, it was argued on behalf of a railroad employee in a Virginia case, Southern R. Co. v. Jacobs, 116 Va. 189, 81 S.E. 99, that the defense of the assumption of the risk in the last mentioned sense was no longer available to a railroad carrier, and that the Act, 45 U.S.C.A. § 51 et seq., was intended to be punitive of negligence and did not cast on the employees of a carrier an assumption of the risk of any condition caused by the carrier's neglect. But this contention was rejected by the Virginia court: and its decision was affirmed in Jacobs v. Southern R. Co., 241 U.S. 229, 234, 36 S.Ct. 588, 591, 60 L.Ed. 970, where it was pointed out that the defense was abolished by § 4 of the Act only where the negligence of the carrier is in violation of some statute enacted for the safety of employees, and that the defense was still available not only as to "the ordinary risks inherent in the business,—the unavoidable risks which are intrinsic notwithstand-

ing the performance by the carrier of its personal duties", but also as to "the 'secondary and ulterior' risks arising from abnormal dangers due to the employer's negligence." See, also, Boldt v. Pennsylvania R. R. Co., 245 U.S. 441, 38 S.Ct. 139, 62 L.Ed. 385; Delaware, etc., R. Co. v. Koske, 279 U.S. 7, 49 S.Ct. 202, 73 L.Ed. 578.

It was to cut off this right of the carrier to avoid the consequences of its own neglect and in recognition of the needs of employees exposed to the grave hazards of railroading that the amendment of 1939 was enacted. Under the section in its original form the carrier had been exculpated from liability in such a hard case as Hallstein v. Pennsylvania R. Co., 6 Cir., 30 F.2d 594, where an employee was held to have assumed the risk of his employer's failure to furnish a safety belt although he had demanded it and proceeded with the work only when threatened with discharge. This case was mentioned in Report No. 661 of the Senate Committee on the Judiciary of the 76th Congress, 1st Session, of June 22, 1939, as illustrating an exceptionally harsh feature of the rule which it was desired to eliminate; and it is clear from the report as a whole that the purpose in mind was to enlarge the employees' protection by providing that in all cases in which injury results from the negligence of an employee or fellow servant, the defense of assumption of the risk should no longer be available, and at the same time to retain the provision of the existing law that the employer should be deprived of the defense if the violation of any safety statute should contribute to the injury of an employee.

It is significant that Congress made no provision in the amendment with respect to the other risks to which railroad workers are exposed, namely, the ordinary risks inherent in railroading despite the use of the required safety appliances and the exercise of due care by a carrier for the protection of its men. The amendment speaks only of injuries resulting from the carrier's negligence, and does not attempt to raise the standard of care required of a carrier with respect to the safety of its employees in the performance of their duties in railroad yards and other places of danger. The omission is especially noticeable in view of the pains which Congress has taken from time to time in the passage of statutes for the protection of railroad employees. See the Safety Appliance Acts, 45 U.S.C.A. §§ 1–16. The conclusion is inescapable that Congress did not intend to enlarge the obligation of carriers to look out for the safety of their men when exposed to the ordinary risks of the business, and that in circumstances other than those provided for in the amended section of the statute, the doctrine of the assumption of the risk must be given its accustomed weight. It is beyond the power of this court to deny the defense in this case. It presents no material difference of fact from situations considered by the courts in numerous decisions and held to be free from negligence on the part of the carriers, and we have no authority to prescribe new standards of conduct in the important field of railroad operations. See Delaware, etc., R. Co. v. Koske, 279 U.S. 7, 11, 49 S.Ct. 202, 73 L.Ed. 578; Toledo, St. L. & W. R. Co. v. Allen, 276 U.S. 165, 170, 48 S. Ct. 215, 72 L.Ed. 513.

Affirmed.