## HANDY v. READING CO.
### Civil Action No. 5024.

District Court, E. D. Pennsylvania.
June 19, 1946.

B. Nathaniel Richter, of Philadelphia, Pa., for plaintiff.

Henry R. Heebner, of Philadelphia, Pa., for defendant.

WYCHE, District Judge, Designate.

This is an action by the plaintiff, under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for injuries sustained while in the defendant's employ as an electrician, when, after having inspected the electrical equipment on a locomotive, he stepped down toward the ground, into an open ditch or sump containing scalding water.

The complaint alleges, inter alia, that the defendant failed to provide a safe place for the plaintiff to work, failed to light the yard properly, and carelessly maintained a vat containing scalding water, and permitted the same to remain in the vicinity where plaintiff was working, without notice or warning of its presence.

At the conclusion of the evidence, the defendant moved for a directed verdict upon the ground that the plaintiff had failed to show the violation of any duty toward him by the defendant, which resulted in his injuries. The motion was overruled, the case was submitted to the jury, following the charge, to which no exceptions were taken, and the jury returned a verdict for the plaintiff in the sum of Eighteen Thousand

($18,000) Dollars. The matter is now before me on the motion of the defendant for judgment non obstante veredicto, and, failing in that, for a new trial.

The evidence discloses that on February 23, 1945, about ten o'clock at night, the plaintiff was instructed to cut-in the electrical equipment in the cab of a locomotive of the defendant, which had been left facing north on a track, very close to a high retaining wall on the east side. Before entering the engine cab on the left-hand or fireman's side, the plaintiff cut-in the switch on the right side with a stick, then walked around in front of the locomotive, and cut-in "the pneumatic portion," which is controlled at a point just under the cab on the fireman's side. Then he mounted the cab on the fireman's side and worked across to the right-hand side of the engine, inspecting the various indicators, ascertaining whether or not they were in proper operating condition. After completing his work, the plaintiff looked down toward the ground from the right-hand side of the cab of the engine, saw nothing unusual, turned and climbed down the engine stirrups, backwards, facing the side of the engine. When he reached the bottom stirrup, he stepped down to what he thought was the ground; actually, he stepped into an open ditch or sump, containing scalding water, estimated to be from six to eight inches deep, causing his feet to be badly scalded.

The sump into which the plaintiff stepped was an unprotected opening about two feet square, and about two feet deep, and was at the end of an open and unprotected drainage ditch about one hundred and twenty-five feet long running between the retaining wall and the railroad track, and was used to carry off water that came from the overflow of the tanks when they were filled at the water spout, from the overhead structure, and from the scalding water and steam drained from the boilers of locomotives when they were "blown down".

Though there were two lights, one within thirty-five feet of the accident area, and another about fifty feet away from the point of the accident, neither of these afforded any light in the narrow space between the retaining wall and the east side of the locomotive. There were no signs or notices of any kind to warn of the presence of the scalding water in the ditch or sump, and unless one touched the water in the ditch, at night one could not ascertain the presence of scalding water in the ditch or the sump.

The defendant had no rule about any special way, or side from which its electricians should descend from an engine after checking the electrical equipment. It was a matter of the individual's choice. On the left-hand side of the locomotive upon which plaintiff was working there were other tracks, on the side the plaintiff descended there were none. Plaintiff testified that he was not familiar with the area and did not know of the presence of the sump or the drainage ditch.

As a result of the accident, the plaintiff suffered third degree burns of both feet; he was confined to the hospital for seventy-five days; the skin sloughed off of his feet in large areas; he suffered severe pain each time his feet were dressed; he suffered loss of sleep; two skin grafting operations were performed upon his thighs in order to obtain skin to graft upon the burnt portions of his feet; plaintiff was given numerous injections of penicillin each day for seventeen days to relieve infection in his feet.

After leaving the hospital the plaintiff returned to the hospital for fifteen or more treatments. He could not put on his shoes for several weeks after his return home. His feet are always cold; they are discolored and disfigured. Plaintiff is still under the medical care of doctors. It is necessary for him, in order to be able to work, to give several hours each day to exercising, using contrast baths, dressing and care of his feet. The testimony discloses that he has suffered permanent injuries.

Plaintiff returned to work June 17, 1945, at the same rate of pay, and tried inspecting locomotives in the open, which was not so strenuous as the work he formerly performed in the shop, but with the advent of cold weather, he gave this up for inside work, and finally, for bench work, which he has followed since, except for vacation periods and several other absences.

Plaintiff is fifty years old, married and has four children. He has worked continuously for the defendant for eighteen

years. He earned approximately Thirty Four Hundred ($3400) Dollars, per year.

To sustain its motion for judgment non obstante veredicto, defendant relies upon the cases of Missouri Pac. R. v. Aeby, 1928, 275 U.S. 426, 48 S.Ct. 177, 72 L.Ed. 351, and Delaware, etc., R. v. Koske, 1929, 279 U.S. 7, 49 S.Ct. 202, 73 L.Ed. 578.

The facts in these cases are distinguishable from the facts in this case, and are at variance with the reasoning of the Supreme Court in the more recent cases of Tiller v. Atlantic Coast Line R. Co., 1943, 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967; Blair v. B. & O. R. Co., 1945, 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490, and Bailey v. Central Vermont Ry., 1943, 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444.

Furthermore, it will be seen that the cases relied upon by the defendant were decided before the Amendment of 1939, withdrawing assumption of risk as a defense in Federal Employers' Liability cases. The decision of the Supreme Court in the Tiller Case, supra, indicates that the decision in the Aeby Case was responsible in part for the Amendment of 1939.

In rejecting the argument that, since the doctrine of assumption of risk had been abolished, the carrier can no longer interpose it as a shield against the consequences of its neglect, and hence is liable for injuries to its employees in its railroad yards or elsewhere, unless it takes precautions for their safety commensurate with the danger that they are likely to encounter, the Circuit Court of Appeals of the Fourth Circuit, in the Tiller Case said [318 U.S. 54, 63 S.Ct. 446]: "The conclusion is inescapable that Congress did not intend to enlarge the obligation of carriers to look out for the safety of their men when ex-posed to the ordinary risks of the business, and that in circumstances other than those provided for in the amended section of the statute, *the doctrine of the assumption of the risk must be given its accustomed weight.*" (Emphasis added) Tiller v. Atlantic Coast Line R. Co., 4 Cir., 128 F.2d 420. In reversing the decision of the Fourth Circuit in this case, the Supreme Court said: "We find it unnecessary to consider whether there is any merit in such a conceptual distinction between aspects of assumption of risk which seem functionally so identical, and hence we need not pause over the cases cited by the court below, all decided before the 1939 amendment, which treat assumption of risk sometimes as a defense to negligence, sometimes as the equivalent of non-negligence.[1] We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to 'non-negligence.' As this Court said in facing the hazy margin between negligence and assumption of risk as involved in the Safety Appliance Act of 1893, 45 U.S.C.A. § 1 et seq., 'Unless great care be taken, the servant's rights will be sacrificed by simply charging him with assumption of the risk under another name;' and no such result can be permitted here. * * * Aside from the difficulty of distinguishing between contributory negligence and assumption of risk many other problems arose. One of these was the application of the 'primary duty rule' in which contributory negligence through violation of a company rule became assumption of risk. * * * Other complications arose from the introduction

---

[1] "See, e. g., Toledo, St. L. & W. R. Co. v. Allen, 276 U.S. 165, 171, 172, 48 S.Ct. 215, 217, 72 L.Ed. 513; Missouri Pacific R. Co. v. Aeby, 275 U.S. 426, 430, 48 S.Ct. 177, 179, 72 L.Ed. 351. It is sometimes said that courts have held the master blameless in actions by employees who have entered and remained in hazardous occupations on the premise that the employee assumed the risk; but the theory has not always appeared under the name 'assumption of risk' since the same result is reached by assigning a given case to one of three practically interchangeable categories: (a) the employee assumed the risk; (b) he was guilty of contributory negligence; (c) the master was not negligent. See Am.Jur. 719 and 3 Labatt, Master and Servant, 2d ed., par. 1164–1172, 1205, 1210. The court below thought the Amendment eliminated defense (a) but in effect retained defense (c)."

of 'promise to repair', 'simple tool', and 'peremptory order', concepts into the assumption doctrine. In the disposition of cases *the question of a plaintiff's assumption of risk has frequently been treated simply as another way of appraising defendant's negligence, as was done by the court below in the instant case.*

"It was this maze of law which Congress swept into discard with the adoption of the 1939 amendment to the Employers' Liability Act, releasing the employee from the burden of assumption of risk by whatever name it was called. The result is an Act which requires cases tried under the Federal Act to be handled as though no doctrine of assumption of risk had ever existed."

The complaint in the Tiller Case alleged negligent operation of the car which struck Tiller, and failure to provide him a reasonably safe place to work. John Lewis Tiller was a policeman for the railroad. Among his duties was that of inspecting the seals on cars in railroad yards to make sure that no one had tampered with them. He had held this position for some years, was familiar with the yard, and was aware that the railroad's employees "are instructed that they must watch out for the movement of the trains as no employee watches out for them and no lights are used at night on the head end of back-up movements except when an employee is placed at the back end with a lantern to protect a road crossing." On the night of March 20, 1940, Tiller was standing between two tracks in the railroad's switch yards, tracks which allowed him three feet, seven and one-half inches of standing space when trains were moving on both sides. The night was dark and the yard was unlighted. Tiller using a flashlight for the purpose, was inspecting the seals of the train moving slowly on one track when suddenly he was hit and killed by the rear car of a train backing in the opposite direction on the other track. The rear of the train which killed Tiller was unlighted although a brakeman with a lantern was riding on the back step on the side away from Tiller. The bell was ringing on the engine but both trains were moving. It was probable that Tiller did not hear cars approaching from behind him. Under the foregoing facts, the Supreme Court said: "We think that the question of negligence on the part of the railroad and on the part of the employee should have been submitted to the jury."

In the Blair Case, supra, Blair's duties were to load and unload inbound and outbound freight. In unloading a car standing at the platform adjacent to the railroad company's warehouse, Blair came to three 10-inch seamless steel tubes, approximately 30 feet long and weighing slightly more than a thousand pounds each. The pipes were greased and slick. Upon Blair's complaint that the pipes were too heavy for him to move by himself, Mr. Miller, the car inspector, and Mr. Fanno, the section man, were assigned to help him. The men took the nose truck into the car, managed to get the first pipe lengthwise on it, worked it through the car door to the platform over a steel bridge connecting the car and the platform, and then carried it to the waiting truck. Blair held one handle of the nose truck with one hand and the steel tube with the other. The first tube was successfully moved. While they were attempting to move the second tube in the same manner, it slipped. Fanno and Miller released their holds, but Blair did not. The heavy tube in slipping caused the truck to kick back resulting in Blair's injuries. The evidence indicated that the immediate cause of the greasy pipe's slipping as it did was either (1) an uneven place on the warehouse floor due to its having sunken in; or (2) pushing the nose truck against the standing company truck with such force as to make the tube move with great suddenness. The fact that Fanno and Miller released their grips after it began to slip also contributed to the suddenness and force of the kickback of the nosetruck which caused Blair's injury. The Supreme Court said, in reversing the Supreme Court of Pennsylvania: "We think there was sufficient evidence to submit to the jury the question of negligence posed by the complaint. The duty of the employer 'becomes "more imperative" as the risk increases.' * * * And especially is this true in a case such as this, where the several elements from which negligence might be inferred are so closely interwoven as to form

a single pattern, and where each imparts character to the others. * * * We cannot say as a matter of law that the railroad complied with its duties in a reasonably careful manner under the circumstances here, nor that the conduct which the jury might have found to be negligent did not contribute to petitioner's injury 'in whole or in part.' Consequently we think the jury, and not the court should finally determine these issues. [323 U.S. 600, 65 S.Ct. 547.]"

In the Bailey Case, supra, [319 U.S. 350, 63 S.Ct. 1063], Bailey, a sectionman for the Central Vermont Railway, was attempting to open the hopper of a cinder car with a wrench, when the nut spun and Bailey was thrown by the wrench into the roadway below, inflicting injuries upon him from which he died.[2] In reversing the judgment of the Supreme Court of Vermont, the Supreme Court declared: "There was in our view sufficient evidence to go to the jury on the question whether, as alleged in the complaint, respondent was negligent in failing to use reasonable care in furnishing Bailey with a safe place to do the work.

* * * At common law the duty of the employer to use reasonable care in furnishing his employees with a safe place to work was plain. * * * That rule is deeply engrained in federal jurisprudence. * * * it is a duty which becomes 'more imperative' as the risk increases. 'Reasonable care becomes, then, a demand of higher supremacy, and yet, in all cases it is a question of the reasonableness of the care, reasonableness depending upon the danger attending the place or the machinery.' * * * It is that rule which obtains under the Employers Liability Act. * * * That duty of the carrier is a 'continuing one' * * * from which the carrier is not relieved by the fact that the employee's work at the place in question is fleeting or infrequent. * * * The right to trial by jury is 'a basic and fundamental feature of our system of federal jurisprudence.' * * * It is part and parcel of the remedy afforded railroad workers under the Employers' Liability Act. Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate

[2] The evidence of the accident viewed in a light favorable to Bailey was as follows: The car was pulled onto a bridge over a cattle pass so that the cinders could be dumped through the ties in the bridge floor onto the roadway below. The floor of the bridge was about 18 feet above the ground. The only available footing at the side of the car was about 12 inches wide. Of this space 8 or 9 inches were taken up by a rasied stringer, i. e., a timber which lay across the ties and was set in 3 or 4 inches from their ends. There was no guard rail. The cinders to be unloaded were in a hopper car. That type of car has doors in the floor which are closed by a chain which winds up on a shaft running crossways of the car. The doors are opened from the side by one man turning a nut on the end of the shaft while another disengages from a ratchet a dog which holds the shaft. A wrench is applied to the nut at the end of the shaft, the operator pulls its handle back to relieve the tension on the dog, the other person releases the dog, the operator of the wrench pushes back on it to open the hopper, and the weight of the material in the car opens the doors. When the hopper starts to open, the shaft spins, and the operator must disengage the wrench or let go of it, lest he be thrown off balance or knocked down. The wrench used by Bailey was a heavy frog wrench—open jaws and a handle about three feet long. It had been used for many years for that purpose and no one had been injured by it. Bailey certainly was unskilled and perhaps unfamiliar in the opening of hopper cars. No one had ever seen him open one. Such an operation was usually performed by men older in point of service. Bailey had been present on a few occasions when hopper cars were unloaded but usually he was on top of the car at the time. Cinders were dumped at this bridge about once a year. As Bailey walked out on the stringer on the bridge and put the wrench on the nut, the section foreman said, "Be careful the wrench doesn't catch you." Bailey at once pushed on the wrench but the hopper did not open; he gave another push on the wrench, the hopper opened, the nut spun, and Bailey was thrown by the wrench into the roadway below. The hopper car could have been opened before it was moved onto the bridge and any cinders which spilled on the roadbed shoveled onto the roadway beneath the bridge. Or after the cinders had been dumped upon the roadbed a railroad tie could have been utilized as a drag to push cinders from the roadbed to the ground below the bridge.

tribunal to apply those standards to the facts of these personal injuries. That method of determining the liability of the carriers and of placing on them the cost of these industrial accidents may be crude, archaic, and expensive as compared with the more modern systems of workmen's compensation. But however inefficient and backward it may be, it is the system which Congress has provided. *To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them."* (Emphasis added)

I have referred to the facts in the Tiller, Blair and Bailey cases for the purpose of comparison with the facts in the instant case.

■ In this case there was a duty upon the defendant to use reasonable care to furnish its electricians a reasonably safe place to do their work, a reasonably safe place to mount the cab of the engine, and a reasonably safe place to land when descending from the cab of the engine. The defendant, without interfering with the operation of its railroad, could have easily covered the ditch and the sump, or could have placed signs to warn of the dangers of scalding water flowing therein. The holster, a servant of the defendant, could have, without any interference with the ordinary operation of the railroad, placed the engine upon the same track, or upon another track, where the plaintiff could have performed his work in safety.

■ The fact that the nature of the work which the plaintiff was directed to undertake required labor on both sides of the engine, the narrow, dark space between the engine and the retaining wall, the absence of light therein, the presence of the uncovered and unguarded sump containing scalding water just under the lowest stirrup of the ladder to the cab of the engine into which an employee would likely step either in descending or mounting the right side of the cab of the engine at night; the fact that a servant of the defendant placed the engine in such a dangerous and hazardous situation when he could have, without interfering with the ordinary operation of the railroad, placed it on the same track, or upon another track in a safe place; the fact that plaintiff testified that he was unfamiliar with the area of the accident, or the presence of the sump or of the scalding water; the fact that one could not ascertain the presence of scalding water in the ditch or sump at night without touching it; the absence of notice or warning of the scalding water in the ditch or sump; plaintiff's testimony that he looked down toward the ground before descending from the cab and saw nothing unusual; whether the plaintiff used due care under all the circumstances; all of these were facts and circumstances for the jury to consider, and weigh in determining whether the defendant was negligent in furnishing the plaintiff with that particular place in which to perform his work; whether the defendant used reasonable care in furnishing the plaintiff a reasonably safe place in which to work; whether the violation of such duty was the proximate cause of plaintiff's injury; and, whether the plaintiff was guilty of contributory negligence, as alleged, and, if so, to what extent the damages should be diminished under the provisions of the Federal Employers' Liability Act.[3]

The defendant bases its motion for a

---

[3] The Federal Employers' Liability Act, 45 U.S.C.A. § 51, provides: "Every common carrier by railroad while engaging in commerce between any of the several States * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * * for such injury * * * resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. * * *"

The 1939 Amendment, 45 U.S.C.A. § 54, provides: "* * * any action brought against any common carrier * * * to recover damages for injuries to, * * * any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury * * * resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier."

45 U.S.C.A. § 53, provides: "In all actions * * * brought against any such common carrier * * * to recover damages for personal injuries to an employee, * * * the fact that the em-

new trial on the sole ground that the verdict of the jury was highly excessive because (1) the amount awarded far surpasses reasonable compensation for plaintiff's loss of earnings, expenses, pain and suffering; and, (2) because the jury failed to give any consideration to that portion of the charge wherein the jury was instructed that if their findings should be in favor of the plaintiff, they should reduce the amount of their award in proportion to the plaintiff's contributory negligence.

In addition to plaintiff's injuries, his present, past and anticipatory pain and suffering both in mind and body, the testimony shows his loss of earnings to date to be Sixteen Hundred ($1600) Dollars, and his medical bills to date to be approximately Three Hundred, Sixty Five ($365) Dollars. The doctors' testimony indicates treatment should be continued for an indefinite period of time, to be discontinued, however, if such treatments do not produce reasonable results within a reasonable time. The testimony discloses that his injuries are permanent and that he will continue to suffer indefinitely.

Courts in general are reluctant to disturb a jury's verdict on the ground of excessiveness where the damages are unliquidated, and there is no fixed measure of mathematical certainty. This is particularly significant with respect to damages in tort actions for personal injuries. Armit v. Loveland, 3 Cir., 115 F.2d 308, 314. However, it may be expressed by a court, summarized, the rule is that, the trial judge will not interfere with a jury's verdict simply because it is greater than his own estimate; only where the verdict is so grossly excessive as to shock the conscience of the court and clearly manifest that it was the result of caprice, passion, partiality, prejudice, corruption, or other improper motives, will the court intervene. In determining whether a verdict is excessive it must be remembered that the maximum amount which a jury might properly award as damages under the evidence in a personal injury case cannot be determined with any degree of certainty, and must be largely a matter of judgment; the view most favorable to the plaintiff must be inferred from the evidence, and if there is substantial evidence to sustain the verdict it will not be disturbed. Jones v. Atlantic Refining Co., D.C., 55 F.Supp. 17.

It may be that if I had tried this case without a jury I would have rendered a verdict for the plaintiff in a lesser amount than that returned by the jury, but I cannot say that the verdict of the jury is so grossly excessive as to shock the conscience of the court, or clearly manifest that it was the result of caprice, passion, partiality, prejudice, corruption, or other improper motives.

For the foregoing reasons the motion for judgment non obstante veredicto, and the motion for a new trial will be denied. Order accordingly may be submitted.

---

ployee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee * * *."