16203

HASELDEN v. ATLANTIC COAST LINE R. CO.

(53 S. E. (2d) 60)

*Messrs. Dargan, Paulling & James,* of Darlington, *John F. Wilmeth,* of Hartsville, and *Woods & Woods,* of Marion, *for Appellant,*

*Messrs. Mozingo & Watts and C. R. Parrott,* of Darlington, *for Respondent,*

*Messrs. Dargan, Paulling & James,* of Darlington, *John F. Wilmeth,* of Hartsville, and *Woods & Woods,* of Marion, *for Appellant,* in reply,

April 1, 1949.

TAYLOR, Justice.

The respondent, a section master of the appellant, brought this action in the Court of Common Pleas for Darlington County under the Federal Employers' Liability Act, 45 U. S. C. A. § 51, to recover damages for injuries sustained by him while he and his section crew were loading rails on a gondola car at Society Hill, S. C. The appellant by way of answer after admitting certain formal allegations of the complaint in substance entered a general denial and set up by way of an affirmative defense, contributory negligence and assumption of risk.

The case came on for a trial before Honorable J. Woodrow Lewis, the presiding Judge and a jury, resulting in a verdict for the plaintiff in the sum of $45,000.00. Timely motions

were made for a nonsuit, directed verdict and for judgment in favor of the defendant *"non obstante veredicto"* all of which were refused and appellant now comes before this court upon twenty-five exceptions which pose the following questions as stated by appellant:

I. Did the trial judge err in refusing any or all of appellant's motions for nonsuit, for a directed verdict, for judgement *non obstante veredicto,* and for a new trial, based upon failure of proof of actionable negligence?

II. Did the trial judge err in refusing any or all of appellant's motions for nonsuit, for a directed verdict, for judgment *non obstante veredicto,* and for a new trial, on the ground that respondent's negligence was the sole cause of his injury?

III. Did the trial judge err in refusing appellant's motions for a mistrial and for a new trial, based upon respondent's attempt to get before the jury highly prejudicial testimony previously excluded?

IV. Did the trial judge err in charging the jury that there is a positive duty on the part of the master to furnish the servant with reasonably safe instrumentalities wherewith and places wherein to work?

V. Did the trial judge abuse his discretion in refusing to grant a new trial on the ground that the verdict was so excessive as to show caprice, passion and prejudice on the part of the jury?

VI. Was the order of the trial judge refusing appellant's motion for judgment *non obstante veredicto* or for a new trial in the alternative erroneous in that he thereby adjudicated vital issues of fact as if the facts involved were undisputed, completely excluding and disregarding the preponderance of the evidence relating thereto, adduced by or on behalf of the appellant?

We will first consider whether or not the trial judge erred in refusing any or all of appellant's motions for a nonsuit, directed verdict, judgment *non obstante*

*veredicto,* or a new trial, based upon an absence of evidence as to actionable negligence, and in doing so we will adhere to the well settled rule of this court that where the appeal is from the refusal to grant a nonsuit, or directed verdict we adopt the view of evidence most favorable to the verdict and give it the strongest probative force of which it will admit. *Langston v. Atlantic Coast'Line Ry. Co. et al.,* 197 S. C. 469, 15 S. E. (2d) 758.

The testimony shows that plaintiff, approximately forty years of age is married and has a wife and children dependent upon him for support. That at the time of his injury he was employed as a section foreman for the appellant railway company and was responsible for maintenance and repair of a section of appellant's railway tracks in and near Society Hill, S. C. On July 9th, 1946, respondent received orders from his. immediate superior, Mr. Dail, road master of the defendant company, to load ten rails which were located across a ditch from appellant's tracks, said rails to be used in repairing the tracks at various places along the line. Plaintiff's testimony was to the effect that he ordered a flat car for this purpose and was informed that none was available, whereupon he informed them that if a gondola car was sent he would not be able to load the rails from where they were located unless he had additional help, which was denied him, said rails being thirty-three reet in length and weighing eighty-five pounds to the yard. He was then told to place some skids and load from the side using some short rails as skids and rope with which to pull the rails up the skids. Respondent testified in part as follows:

"Q. Where were you? A. Inside the car.

Q. Where were the other men? A. Three men on the ground and myself and two men in the car. We pulled the rail on this end to about six or eight inches and then tied the rope over here and go back and pull this end of the rail up until we got it within our reach. The men on the ground pushed and. stayed there until the men could come around

the car and get in, by taking the rope off while they were coming around and walking over and laid it on the end of, the car and I turned around came back and the men pulled the rail just as I was walking up the car and the rail turned and come on me and hit my leg, and I slipped down and my leg jerked me back into it.

Q. Now, you say that the men here were pushing until it got out of reach? A. Yes.

Q. If you had had a flat car as you ordered, would it have been necessary for them to push it that high up? A. They could have pushed it up without getting it out of reach.

Q. The rail would not have ever been out of reach to the men on the ground? A. No.

Q. If you had had a flat car as you ordered and did not receive, what would have been the way that it would have been loaded? A. You could load on the skid but you would have had power to push it up with. Pulling with a small rope, we did not have power to load.

Q. What happened after that? A. Well, I was jerked down and it caught my foot and I tried to straighten up and fell over backwards. I had to ask one of the men to untie my shoe.

Q. Now these were being loaded, I believe you said, from across a ditch? A. Yes.

Q. And all of this was pursuant to, and the way you loaded this car, was pursuant to instructions received by you from the road master, Mr. Dail? A. Yes.

Q. And the rail crushed your foot, did you go to a doctor? A. Yes.

Q. Now, Mr. Haselden, when you were talking to the road master there about loading these rails, state whether or not you asked for additional help? A. I did; I asked him to let Mr. Jones come up and help me load.

Q. Who is Mr. Jones? A. He is the section foreman up above me at Cheraw.

Q. Does Mr. Jones have a crew of men? A. Yes; the same as I do.

Q. And this help was not given you? A. No; he said I could load my rails and put up the skid and go ahead and load it."

The foregoing and other testimony adduced is to the effect that plaintiff informed his immediate superior that he could not load rails on a gondola car from across the ditch, the sides of the car being approximately two and one half feet higher than the sides of a flat car. The request for additional help was rejected with respondent being instructed to get skids and load in the manner which was employed, the rope being passed around one end of the rail which was pulled higher on the skids by the men in the car, those on the ground pushing, until the rail had reached a position approximately six inches from the top of the car. To prevent it from sliding back down the skids the rope was made fast and the workmen proceeded to handle the other end in a like manner. After securing one end of the sixth rail respondent was proceeding to the other end to assist there when one end of the rail, which was bent, struck the car throwing it into the car and striking respondent's leg and foot.

In considering the evidence in this case we are mindful of the principle of law laid down in *Shivar v. Atlantic Coast Line Railway Co.*, 155 S. C. 531, 152 S. E. 717, to the effect that the evidence and exceptions should be considered in the light of the Federal decisions interpreting the Federal Employers' Liability Act, 45 U. S. C. A. §§ 51-59.

In the very recent case of *Wilkerson v. McCarthy & Swan* as Trustees of the Denver & Rio Grande Western Ry. Co., 1949, 336 U. S. 53, 69 S. Ct. 413, 415, it is reiterated that: "It is the established rule that in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of a litigant against whom a peremptory instruction has been given"; in *Lavender v. Kurn*, 327 U. S. 645, 652, 653, 66 S. Ct. 740, 90 L. Ed.

916; *Bailey v. Central Vermont Ry. Co.*, 319 U. S. 350, 354, 63 S. Ct. 1062, 87 L. Ed. 1444, and *Tiller v. Atlantic Coast Line Ry. Co.*, 318 U. S. 54, 68, 63 S. Ct. 444, 87 L. Ed. 610, 143 A. L. R. 967, it was held that where jury trials are required, courts must submit the issues of negligence to a jury if evidence might justify a finding either way on those issues; and Justice Douglas concurring in the same opinion states:

"The criterion governing the exercise of our discretion in granting or denying certiorari is not who loses below but whether the jury function in passing on disputed questions of fact and in drawing inferences from proven facts has been respected.

\* \* \*

"The Federal Employers' Liability Act was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations. Not all these costs were imposed, for the Act did not make the employer an insurer. The liability which it imposed was the liability for negligence. But judges had created numerous defenses—fellow-servant rule, assumption of risk, contributory negligence—so that the employer was often effectively insulated from liability even though it was responsible for maintenance of unsafe conditions of work. The purpose of the Act was to change that strict rule of liability, to lift from employees the 'prodigious burden' of personal injuries which that system had placed upon them, and to relieve men 'who by the exigencies and necessities of life are bound to labor' from the risks and hazards that could be avoided or lessened 'by the exercise of proper care on the part of the employer in providing safe and proper machinery and equipment with which the employee does his work.' "

In our opinion the defendant's motions for a nonsuit, directed verdict, and judgment for the defendant *non obstante veredicto* on the grounds of failure of proof of actionable negligence and that respondent's negligence

was the sole cause of his injury, were properly denied. We are satisfied the evidence is sufficient to make an issue for the jury. *Langston v. Atlantic Coast Line Railway Co.,* 197 S. C. 469, 15 S. E. (2d) 758; *Mills v. Atlantic Coast Line Railway Co.,* 85 S. C. 463, 67 S. E. 565; *Norwood v. Atlantic Coast Line Railway Co.,* 203 S. C. 456, 27 S. E. (2d) 803; *Harrison v. Atlantic Coast Line Railway Co.,* 196 S. C. 259, 13 S. E. (2d) 137; *Cook v. Atlantic Coast Line,* 196 S. C. 230, 13 S. E. (2d) 1, 133 A. L. R. 1144; *Carter v. Atlantic Coast Line Railway Co.,* 203 S. C. 456, 27 S. E. (2d) 17; *Smith v. Southern Railway Co.,* 207 S. C. 179, 35 S. E. (2d) 225, and many other cases cited in these decisions.

In the process of the trial the following transpired while respondent was on the stand:

"Q. Since that time has the railroad given instructions?
* * *

Mr. Paulling: I object to that, what happened since that time. We are trying a case of an accident to Mr. Haselden's foot, and anything since then we do not think is competent.

The Court: I sustain the objection. You gentlemen will disregard what happened after this accident if anything did happen, it has nothing, no bearing on the case."

During cross examination of the witness J. G. Dail, by the same counsel, the following transpired: "Since this time there has been strict orders given by the railroad, have there not, not to load rails in a gondola?

"Mr. Paulling: If your Honor, please, you ruled that out a while ago.

Mr. Mozingo: He did on direct examination.

Mr. Paulling: It makes no difference when it comes out.

Mr. Mozingo: I think it does on cross examination, he says he has to see to the safety of the personnel.

Mr. Paulling: May we ask for the jury to retire?

The Court: I don't think so, I am going to exclude the testimony.

Mr. Paulling: At this time I would like to make a motion for a mistrial, that is the second time that an attempt has been made over your Honor's ruling and that testimony is highly prejudicial.

The Court: I refuse the motion for a mistrial, I don't see that the testimony is prejudicial. I do sustain your objection and I instruct you gentlemen that that has no bearing upon the case, and that you are not to consider it in any manner whatsoever, anything that took place after this occurrence on July 10, 1946."

The position is now taken that it was error to refuse this motion for a mistrial on the grounds that appellant was prejudiced thereby. Plaintiff alleged in his complaint among other things that defendant was negligent in failing to provide plaintiff with proper supervision and instructions with which to work and in failing to provide reasonable and safe plans and methods with which to work in loading said rails. These allegations were denied by the defendant in its answer. If the evidence attempted to be elicited is admissible for any purpose a mistrial would not be properly predicated upon misconduct of counsel in asking the question, even though it not be admissible to prove negligence on the part of the defendant.

It is unnecessary for this court to determine whether or not this proffered evidence was competent or not under any theory of the law as an examination of the record shows that the question attempted to be asked on direct examination was never completed by reason of appellant's objection which was sustained by the trial judge in the following language: "You gentlemen (the jury) will disregard what happened after this accident; if anything did happen, it has nothing, no bearing on the case." Then upon cross examination when the question was completed, objection and a motion for a mistrial being made by appellant's counsel, respondent's counsel explained to the Court that he was of the opinion that such question was permissible upon cross examination.

The Court in refusing appellant's motion stated "I refuse the motion for a mistrial, I don't see that the testimony is prejudicial, I do sustain your objection and I instruct you gentlemen that, that has no bearing upon the case and that you are not to consider it in any manner whatsoever, anything that took place after this occurrence on July 10, 1946."

In the case of *Shockley v. Cox Circus Co.*, 204 S. C. 353, 29 S. E. (2d) 491, 494, where counsel repeatedly asked questions of the same matter and purpose, when conducting a cross examination, and objections to such questions were as often sustained, this Court in disposing of the question of alleged error therein said:

"It is established that counsel cannot, even on cross-examination, ask groundless questions for the purpose and with the result of prejudicing a party (who is testifying) by the nature of the questions. (Citing cases.) But the stated rule must be harmonized with the ordinarily wide range which cross-examination may properly take. It is this problem which is largely for the solution of the trial judge, in the exercise of his discretion, to the end that the trial will be fair and its result unaffected by prejudice."

In the case of *Entzminger v. Seigler,* 186 S. C. 194, 195 S. E. 244, 246, this Court said:

"A case where counsel persists in pursuing a line of interrogation which the court rules to be wrong, and which one reasonably well acquainted with the rules governing the admission of evidence must know to be improper and prejudicial, is to be distinguished from one where the attorney in good faith, although persistently, obtains the rulings of the court upon the admissibility of evidence not patently inadmissible. The latter course of action does not ordinarily furnish any ground for reversal. *Collins v. Atlantic Coast Line R. Co., supra* [183 S. C. 284, 190 S. E. 817]; * * *. Necessarily, each case must be judged on its own facts and circumstances. There can be no misconduct in asking a question, the propriety of which is merely doubtful."

The general rule that the granting of a motion for a retrial by reason of anything occurring during the trial of the case is within the sound discretion of the judge and his ruling thereabout will not be disturbed unless there has been an abuse of discretion, was confirmed in the very recent case of *Gordon v. Rothberg,* 213 S. C. 492, 50 S. E. (2d) 202, there as in instant case the trial judge instructed the jury to disregard the remark.

Respondent asked the completed question only once and it was never answered. The trial judge then instructed the jury very clearly that it should be disregarded. It is largely for the purpose of handling such situations, that arise in many trials, that the presiding judge is allowed to use his discretion to the end that the trial will be fair and unaffected by prejudice. This question is resolved against the appellant as this court is unwilling, under these circumstances, to say that his honor, in refusing the motion, abused his discretion and thereby committed error of law.

Appellant also takes the position that the trial judge erred in stating the following in his charge to the jury:

"Now, I charge you, gentlemen, that there is a *positive* duty on the part of the master to furnish the servant with reasonably safe instrumentalities wherewith and places wherein to work. The master is required to furnish his servant with such proper tools and appliances as may be required for the reasonable safe prosecution of the work. To make the master liable for failure to furnish tools and appliances it must be shown that the tools and appliances were necessary, and that they were not at hand at the time."

A comparison of this portion of the charge with the language of this court in the case of *Tucker v. Holly Hill Lumber Co.,* 200 S. C. 259, 20 S. E. (2d) 704, 707, shows that the two are very similar as the following language was used:

"It is the *positive* duty of the master to furnish the servant with reasonably safe instrumentalities wherewith and places

wherein to do his work, and in the performance of these obligations imposed by law upon the master, the servant may assume that the master has performed such duties"; and in the case of *Nuckolls v. Great Atlantic & Tea Co.,* 192 S. C. 156, 5 S. E. (2d) 862, 864, the court had this to say: "It is the duty of the master to furnish the servant a reasonably safe place to work and reasonably safe and suitable tools and appliances. These duties are *positive,* absolute and personal."

As will be observed the charge under consideration here is not as far reaching as that in the *Nuckolls case.* Appellant takes the position that the duty is not an absolute one and cites the case of *Yazoo & Mississippi Valley Ry. Co. v. Mullins,* 249 U. S. 531, 39 S. Ct. 368, 63 L. Ed. 754, and *Baltimore & O. S. W. R. Co. v. Carroll,* 280 U. S. 491, 50 S. Ct. 182, 74 L. Ed. 566, as authority. An examination of the charges in these two cases shows that the word "absolute" was used while in the charge under consideration the word "positive" was used, appellant taking the position that the words "positive" and "absolute" are synonymous. In Vol. 33, Words and Phrases, Perm. Ed., page 57, we find the following:

"In an action for injuries to a servant, a charge that 'the master owes the positive duty to an employe to provide him with a reasonably safe place in which to work, so far as the nature of the work undertaken and the exigencies of the case will permit the same to be made reasonably safe,' is a correct statement of the law, and is not objectionable as requiring the master to insure the safety of the place; the word 'positive' being used rather as the antithesis of the word 'delegable' than as a measure of the diligence required of a master. *Harris v. Brown's Bay Logging Co.,* 57 Wash. 8, 106 P. 152, 154." .

In the case of *Patton v. Texas & Pacific Ry. Co.,* 179 U. S. 658, 21 S. Ct. 275, 277, 45 L. Ed. 361, the following language is used: .

"That while the employer is bound to provide a safe place and safe machinery in which and with which the employee is to work, and while this is a *positive* duty resting upon him, and one which he may not avoid by turning it over to some employee, it is also true that there is no guaranty by the employer that place and machinery shall be absolutely safe." See also *Bailey v. Central Vermont R. Co.*, 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444.

It is apparent that the language used in this case was approved in the *Patton* and *Bailey cases*.

Considering the charge further we find that the learned trial judge did not stop with the above quoted statement but continued saying:

"It is the duty of the master to furnish a sufficient number of men to do the work in which the servant is engaged with reasonable safety, or with reasonable safety to all here engaged in the accomplishment or the performance of that particular work. It is the duty of the master to furnish a safe number of persons to perform the services required, or do the particular work or piece of work assigned. The test or degree of care that the master must exercise is due care, that is, it is the duty of the master to exercise due care to protect the servant from injury."

Taking the charge as a whole we see no error therein and counsel was evidently satisfied at the time as at the conclusion of his charge the trial judge inquired if there was "any thing further" for either the plaintiff or the defendant and counsel for both parties replied in the negative.

This question is resolved against the appellant.

The next question for determination by this court is whether or not the trial judge abused his discretion in refusing to grant a new trial on the ground that the verdict was so excessive as to show caprice, passion and prejudice on the part of the jury. It is undisputed that claimant is suffering from some degree of disability

but appellant contends that this disability is something less than one hundred per cent (how much they do not say). This question has admittedly given this court grave concern as it is apparently the largest verdict ever given in this state for a similar injury. However, the fact that no verdict of this size has been given heretofore for a similar injury does not of itself portend excessiveness, passion, prejudice or capriciousness. It is well, therefore, for the determination of this question that we review other cases of a similar nature keeping in mind the frequently quoted rule that for a verdict to be excessive it must be so much so as to strike mankind, at first blush as being beyond all measure, unreasonable, outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. In short, it must be flagrant, outrageous or extravagant for the court to undertake to draw the line for it has no standard by which to ascertain the excessiveness. 15 Am. Jur., sec. 205, page 623. In arriving at the verdict the jury could consider the loss of future earning power which requires a consideration of all matters which relate to the issue of the disability, the effect which that disability will have on plaintiff's capacity to work, the extent to which the disability will impair the plaintiff's earning capacity, the present value of all losses due to his impaired earning power, *Jones v. Atlantic Refining Co.*, D.C., 55 F. Supp. 17, such physical pain and suffering as reasonably certain will of necessary result in the future from the injury, *Campbell v. Hall et al.*, 210 S. E. 423, 43 S. E. (2d) 129; *Oliver v. Seaboard Airline Ry.*, D.C., 250 F. 652, *Erie Ry. Co. v. Collins*, 253 U. S. 77, 40 S. Ct. 450, 64 L. Ed. 790, and cases cited therein, suffering caused by consequential treatment of the injury, *Sears v. Atlantic Coast Line Co.*, 169 N. C. 446, 86 S. E. 176, and the purchasing power of the dollar, *Bowers et al. v. Charleston & Western Carolina Ry. Co.*, 210 S. C. 367, 42 S. E. (2d) 705. In 15 Am. Jur., section 204, p. 621, we find the following statement of the principle of law applicable thereto ::

"In personal injury actions the courts have for a long time, in passing upon objections of excessiveness * * * of the damages allowed and in comparing present and past verdicts for similar injuries, given consideration to the increased cost of living and the impaired purchasing power of money. * * * As has been said, compensation means compensation in value. It will not do to say that the same amount of money affords the same compensation when money is cheap as when money is dear. The value of money lies not in what it is, but in what it will buy. A sum of money that was fair compensation in value for given injuries when money was dear and its purchasing power was great will not suffice, when money is cheap and its purchasing power is small. Increased cost of living or diminished purchasing power of money not only has been recognized as a proper matter for consideration of the court in passing upon a verdict attacked as excessive or inadequate, but has also been held to be a proper matter for the consideration of the jury in reaching a verdict in the first instance."

Considering the testimony further in the light of this question we find that Dr. Bruce, witness for the plaintiff, testified that there was no union of three toes, that claimant can do some walking but in the light of the work he was trained to do he considered him one hundred per cent disabled. A portion of his testimony appears as follows:

"Q. Would you mind telling the court and jury what your examination showed? A. I saw Mr. Haselden on January 27, 1948, in my office. He came in complaining of having received a severe injury to the left foot on July 10, 1946, while at work, as an Atlantic Coast Line section foreman. The inqury is said to have occurred by a heavy weight, probably 900 pounds, falling on and crushing his left foot. On examination it was discolored and swollen, in an edematous condition in the foot, the toes and ankle of the left foot was all edematous. The left ankle was fairly movable, the left foot was very painful on pressure on the lateral and dorsal sur-

faces. The foot was painful on extension and hypertension. The first toe or great toe, as well as the second, third and fourth toes showed fractures by *x*-rays, and were painful on flexion and hypertension.

"Q. Now, doctor, at the time you saw him that was January, 1948, or approximately three months ago and nearly some eighteen months after the accident? A. Yes.

Q. From the history he gave you? A. Yes.

* * *

Mr. Mozingo: Did he tell you at the time of your examination in what capacity he had been employed by the railroad? A. Yes.

Q. Did he describe to you some of his duties there, what his work consisted of? A. Yes, he did.

"Q. At the time of your examination would you say that he, what percentage of disability would you say he had as to performing those duties as he performed prior to the accident? A. From the physical findings and *x*-ray findings I would say one hundred per cent.

Q. Do you prescribe any operation for him? A. No, sir; I discussed it and I did not advise it. I did discuss it.

Q. I believe you said at the time of your examination that the foot was still giving him pain and during the examination he gave evidence of it being painful? A. Yes; during the examination it gave evidence of being painful and swollen.

* * *

Q. Should Mr. Haselden have an operation? A. I would not advise it, not if he can get by I would not advise it, because it could result in serious trouble.

Q. When you say serious trouble, what do you mean by that? A. Well, if secondary infection set in or loss of the foot would be what I have in mind.

Q. In other words an operation might result in the loss of the entire foot? A. Yes.

Q. Doctor, in reference to his former occupation, you said it was one hundred per cent at that time, state whether or

not that one hundred per cent disability will of course continue until some correction or operation is made? A. Yes, it would. * * *"

Cross examination.

Q. You spoke a moment ago, when you were asked that he was 100 per cent disabled, and I merely want to get that clarified in my mind and the minds of the jury? That does not mean, of course, that the man can't walk and can't stand on his feet because Mr. Haselden can do both, can he? A. Yes; he can stand and walk.

Q. And he has worked since then? A. He has worked some since.

Q. So then he is not one hundred per cent disabled, is he? A. Well, in my opinion he is.

Q. Despite the fact that he walks, which is one use of the foot, and despite the fact that he stands on that foot and walks? A. I will answer you this way, probably he could work an hour and maybe give an hour at a time and maybe for a day or so, and then have to give up entirely because he could not carry on, I don't imagine he could carry on a job that would require any length of time on his feet."

Dr. Weston, another witness for plaintiff, testified that toes number one ( the great toe), and two and three are not united and the portion of his testimony is herewith reproduced:

"Q. He told you what some of his duties were or what type of work he was doing? A. Yes.

Q. In your opinion what would you say his disability was for performing the same work that he was performing at the time of the accident? A. I would say he is totally disabled.

* * *

Q. I say, as far as helping Mr. Haselden, is there any cure for him other than taking an operation? A. No, and I would not want to operate on him.

Q. You would not care to operate on him? A. No.

Q. Why not? A. Well, in the first place, he has very small bones to be grafted, and that would be the only way that I know of that it could be fixed, and the blood supply in that part is apparently involved because of the swelling. I doubt if it would take.

Q. And if it did not take, of course, then what would be the result? A. Well, the chances are he would not be a bit better than he is now and may lose the front part or all of that foot. * * *

Cross examination.

Q. I say, if Mr. Haselden has been working for some months almost continuously prior to the time of his visit to you, would you say that he was permanently injured? A. I did not know he had been.

Q. Well, I am asking you if he had been, would you say he is permanently injured? A. I am simply going by my examination when I say that of the man.

Q. Would you answer my question, if he had been working almost continuously for some months prior to the time of his visit to you, would you say he was permanently injured? A. Well, if he has been working the whole time as he should as foreman, I would probably change my opinion a little bit.

Q. How much time, then would you say, take out if he had worked half time? A. I don't know the hours of a foreman.

Q. Well, if he worked half of the time for which he was employed would you say he was permanently injured? A. Was he walking?

Q. Well, he is walking now? A. Well, I am only testifying he won't be able to carry on as a foreman walking over rails, he told me he had to go over cross ties and all day long, I don't believe without a great deal of pain and discomfort and swelling, and he would have to stop on account of it.

Q. But he would not be permanently disabled if he had been working for a period of months? A. Carrying on full time, you mean?

Q. Well, receiving his pay for full time? A. Well, was he working?

Q. Yes, he was working, would you still say, I asked you the question? A. Yes, I would still say so from the walking standpoint."

Dr. Lide, witness for the defendant, testified there was no union of the two middle toes approximately eighteen months after the injury. Dr. Noell, Chief of Staff of the A. C. L. hospital at Rocky Mount, N. C., witness for the defendant, testified that plaintiff suffered fractures of all five bones of the left foot, those of the number one or big toe was broken in many places. Those of the second and third toes broken and separated, those of the fourth toe broken and the fifth fractured. That the union in the number one toe was not perfect, that there was no union in number two and three but a separation of fragments, that these in his opinion will never knit and that plaintiff will suffer pain and swelling as long as he lives. A portion of his testimony appears as follows:

"Q. Doctor, what disability from the accident has Mr. Haselden sustained other than the injury to his toes, I mean resulting disability as of now, if any? A. Other than his foot, none.

Q. If there is, what would be your opinion or judgment as the chief of staff with your experience in injuries from fractures as to the extent of the present disability of Mr. Haselden at the time of his discharge, the time you last saw him, to perform the work which he formerly was employed by the Atlantic Coast Line, that is section foreman? A. I think he would be able to perform his duties with certain handicaps.

Q. Well, the handicaps would be what? A. Swelling of the foot and pain.

Q. You mean, do I understand you to mean that that is continuous as long as he uses the foot for standing and walking, would it give him pain? A. Yes."

In the case of *Huggins v. Atlantic Coast Line Ry. Co.*, 96 S. C. 267, 79 S. E. 406, 410, plaintiff, a thirty-five year old engineer was severely injured and recovered a verdict of $40,000.00 damages. On appeal it was contended that the verdict was so excessive as to warrant the inference that it was the result of caprice, passion, prejudice or other consideration not found in the evidence. In overruling this contention this court said:

"But in considering the size of the verdict, we must not overlook the fact that plaintiff's injury was severe and his consequent damages were great. At the date of his injury, he was a young man in good health, 35 years old, with a wife. and children dependent upon him for their support, and he was earning from $150.00 to $200.00 a month. Now he is totally and permanently disabled * * * and according to the evidence, he is doomed for the balance of his life to suffer pain of body and necessarily, also, that anguish of mind which is consequent upon his physical suffering and the contemplation of his helpless and hopeless condition."

The injuries in that case were sustained in 1909 and decided by the Supreme Court in 1913. The purchasing power of money then was several times its present value.

In the case of *Edwards v. Atlantic Coast Line Ry. Co.*, 148 S. C. 266, 146 S. E. 97, 107, decided in 1928, a $50,-000.00 verdict for personal injuries was reduced to $40,-000.00 by the judge. This court in considering the question of whether or not the verdict was excessive stated:

"According to the testimony, at the time the plaintiff was injured he was 44 years old and was earning a salary of about $200.00 per month; that up to the time of the injuries received he was in good health and had been in good health all of his life; that following the collision he was confined in a hospital for some time and has not been able to do any work since receiving the injuries, is now almost completely paralyzed, his speech is affected, and is totally and permanently unable to earn a living for himself and family, consisting of

a wife and several children. Such was the testimony of the plaintiff and several other witnesses, including physicians. The defendants offered no testimony to controvert that offered on the part of the plaintiff as to the extent of his injuries. From the testimony the plaintiff appears to be in a most deplorable condition, and this was the opinion of the judge who tried the case, as disclosed by the order he issued in passing upon the motion for a new trial. What credence should be given this testimony as to plaintiff's injuries and all of the testimony in the case was a matter for the jury. His Honor, the presiding judge, who heard all of the testimony, on the motion for a new trial, in his discretion reduced the verdict from $50,000.00 to $40,000.00 but his honor refused to set the verdict aside and grant a new trial absolute as asked for by appellants, and according to our view his honor is amply sustained in his position by the facts of the case."

In *Key v. Carolina & N. W. Ry. Co.*, 165 S. C. 43, 162 S. E. 582, decided in 1931 a verdict of $25,000.00 for personal and permanent injuries resulting in serious impairment of appellant to earn a living was upheld as not excessive, and in *McKinney v. Pittsburg & L. E. Ry. Co.*, D.C., 57 F. Supp. 813, a railway employee with a life expectancy of 26 years with annual earnings of $2,800.00 was given a verdict of $130,000.00 which was reduced to $100,000.00 in 1944. In *Delaney v. New York Central Railroad Co.*, D.C. 1946, 68 F. Supp. 70, 74, the court has this to say with respect to the functions of the court and jury:

"Adding all these items up I can't say that the jury in awarding $165,000.00 was so far wrong that passion or prejudice is manifested. It was a large verdict. However, I have no right to interfere with it unless it is so excessive as to appear to have been given under the influence of passion or prejudice.

"I just can't feel that this jury's verdict comes under that category.

"When there is any margin for a reasonable difference of opinion in the matter, the view of the Court should yield to the verdict of the jury rather than the contrary." *Jones v. Atlantic Refining Co., supra,* 55 F. Supp. 20. The following very well sums up my thoughts on the subject:

"The court must respect the verdict of the jury in fact as well as in pretense or theory and must not interfere or substitute its own judgment for that of the jurors, for to do so would violate a constsitutional privilege to have the fair verdict of the jury and not the fair judgment of the court." *Jones v. Atlantic Refining Co., supra* [55 F. Supp. 20].

The verdict in this case was rendered in May, 1948, while the *Delaney case* was decided in May of 1946. The earnings of Delaney and Haselden were approximately the same. Delaney's life expectancy was thirty-five (35) years against Haselden's 28.8 years.

The rule is: The trial judge will not interfere with a jury's verdict simply because it is greater than his own estimate. Only where the verdict is so grossly excessive as to shock the conscience of the court and clearly manifest that it was the result of caprice, passion, partiality, prejudice, corruption, or other improper motives, will the court intervene. In determining whether a verdict is excessive it must be remembered that the maximum amount which a jury might properly award as damages under the evidence in a personal injury case cannot be determined with any degree of certainty, and must be largely a matter of judgment. The view most favorable to the plaintiff must be inferred from the evidence, and if there is substantial evidence to sustain the verdict it will not be disturbed. *Jones v. Atlantic Refining Co., supra; Handy v. Reading Co.,* D.C., 66 F. Supp. 246.

The jury could have considered in arriving at its verdict, plaintiff's loss of earning power, pain and suffering, future loss of earnings, and future pain and suffering.

Plaintiff sought actual damages and of course is entitled to, only, such as were plead and proven. Although there is

some evidence to the contrary, there is sufficient evidence in the record for the jury to conclude that the respondent is permanently and totally disabled. If such was the case, then his life expectancy of 28.8 at a salary of $245.60 per month would mean that he has suffered the loss of $72,766.24 in earnings alone. It is therefore apparent that the verdict does not exceed the maximum amount recoverable under the law. Plaintiff, a married man with a wife and children dependent upon him for support, at the time of his injury was approximately forty years of age with a life expectancy of 28.8 years and receiving a salary of $214.00 per month and the use of a house valued at $12.00 per month. Later his salary was increased to $245.60 per month. His education was very limited and he is not prepared to do much beyond manual labor. The medical testimony is to the effect that claimant is permanently and totally unable to do this type of work, being able to stand on his feet for only a short period of time, and swelling and pain are his constant companions. He was in the Atlantic Coast Line Ry. Employee's hospital from July 10, 1946 to August 24, 1946, from September 9 to September 18, 1946, from October 2 to October 16, 1946 and October 24 to October 29, 1946, December 1 to December 12, 1946, February 20 to 21, 1947, and July 23 and 24 of the same year. In addition plaintiff made other trips to the hospital and on one occasion it was necessary to remove the maggots from the infected foot. Again in January 1948, approximately eighteen months after the injury, plaintiff again went to the hospital for treatment.

Appellant strongly contends that respondent cannot be totally disabled by reason of the fact that his work sheet showed he worked a total of approximately eight months after being injured.

A portion of respondent's testimony pertinent to this appears as follows:

"Q. When was the first time you tried to go back and do any work? A. It was the first day of April, 1947.

Q. Were you able to perform your duties then? A. No, sir; I was not.

Q. You heard counsel here ask the doctor about your working from May last year until January this year, were you performing your duties the same as you had performed them before? A. No, sir; it was impossible for me to do it.

*   *   *

Q. Now about you going back to work after you got out of the hospital, why did you go back to work? A. Well, I was trying to go back.

Q. Were you able to go back? A. No, sir; I was not but the necessity of my family, my family was in need and I had to go to work."

The learned trial judge in denying the motion for a new trial states:

"Taking all of the facts and circumstances into consideration together with the present value of the dollar, the verdict of the jury appears to me to be reasonable and proper.

"The trial of this case was particularly free from any evidence of bias or prejudice or appeals thereto. Under this record and my personal observation of the conduct of the trial, to hold that this verdict was based upon prejudice or bias would be totally unwarranted and based upon no just grounds."

In so doing we cannot say that he abused his discretion and committed error of law.

There is no merit in appellant's contention that the trial judge erred in his statement of reason for overruling the motion for a judgment *non obstante veredicto* or a new trial in that he disregarded the preponderance of evidence, see *Roundtree v. Atlantic Coast Line Ry. Co.*, 73 S. C. 268, 53 S. E. 424; *Webber v. Ahrens,* 36 S. C. 585, 15 S. E. 732; *Sloan v. Pelzer,* 54 S. C. 314, 32 S. E. 431.

For the foregoing reasons this court is of the opinion that all exceptions should be dismissed and the judgment of the trial court affirmed; and it is so ordered.

Judgment affirmed.

BAKER, C.J., and FISHBURNE, STUKES and OXNER, JJ., concur.