Verna Wofford McCLURE, and Verna Wofford McClure as Ancillary Administratrix of the Estate of Sanford A. McClure, Appellee,

v.

D. S. PRICE and Watson W. Kelly, Appellants.

No. 8396.

United States Court of Appeals Fourth Circuit.

Argued Oct. 18, 1961.

Decided March 19, 1962.

**540**

J. W. Cabaniss, Charleston, S. C. (Hope & Cabaniss, Charleston, S. C., on the brief) for appellants.

Ben Scott Whaley, Charleston, S. C. (Nathaniel L. Barnwell and Norman W. Stevenson, Charleston, S. C., on the brief) for appellee.

Before BOREMAN and BRYAN, Circuit Judges, and BARKSDALE, District Judge.

BOREMAN, Circuit Judge.

These two actions, growing out of a collision on the morning of June 30, 1959, between a passenger automobile and a tractor-trailer, were consolidated for trial before a jury. Verna Wofford McClure, the widow of Sanford A. McClure, brought her individual action against D. S. Price, the owner of the tractor-trailer, and its driver, Watson W. Kelly, for damages for her personal injuries. The McClures resided in Tennessee and Mrs. McClure was there appointed administratrix of the estate of her deceased husband. Subsequently she was appointed in South Carolina as ancillary administratrix of said estate and, in that capacity, instituted an action against the same defendants to recover damages for the unlawful death of her husband. Both actions are based on the alleged negligence of Kelly in the operation of the tractor-trailer. A jury returned a verdict in each case in the amount of $20,000. Motions by defendants for judgments notwithstanding the verdicts or, in the alternative, for new trials, were overruled. Defendants charge that this disposition of the motions was error.

As is not unusual in motor vehicle collision cases, the evidence as to material facts was conflicting. Primarily, defendants contend that, as a matter of law, Mr. McClure was guilty of contributory negligence which was a proximate cause of his death, and that such negligence was imputable to Mrs. McClure in her individual action on the theory that the McClures were engaged in a joint and common enterprise. Other allegations of error will be mentioned and considered but we are of opinion that the verdicts and judgments below should not be disturbed.

The collision occurred in the intersection of Dorchester Avenue and U. S. Highway No. 52–A, also known as Meeting Street Road, about seven miles north of the City of Charleston, South Carolina. Defendant Kelly was driving the tractor-trailer northerly on Meeting Street Road. The tractor-trailer combination had an over-all length of 42 feet and, with its load of 25,000 pounds of bananas, had a total weight of approximately 45,000 pounds. Mr. and Mrs. McClure, with their daughter Carole and her then fiance (later her husband), David Boatman, were proceeding in a westerly direction on Dorchester Avenue toward the Meeting Street Road intersection. Mr. McClure was driving his 1956 Oldsmobile and Mrs. McClure was riding beside him. Carole was riding in the rear seat behind her father and David was beside her to her right.

U. S. Highway No. 52–A is a main thoroughfare between Charleston and Columbia, South Carolina, and, at its intersection with Dorchester Avenue, is divided into two lanes, one for northbound and one for southbound traffic. Approximately over the center of the intersection a traffic signal device was suspended. It is undisputed that, at the time of the accident and for a time prior thereto, the lights facing the traffic on Dorchester Avenue were not operating and a traveler proceeding west on Dorchester Avenue would receive no traffic light signal. However, the lights controlling traffic on Meeting Street Road were in operation. The evidence disclosed a dwelling located at the southeast corner of the intersection of the two roadways and that a traveler going

north on Meeting Street Road and approaching this intersection would not have a clear view of Dorchester Avenue to his right because of this dwelling house and the growth of trees and shrubbery in the yard. Additionally, Meeting Street Road curves for some distance before its intersection with Dorchester Avenue and a northbound driver, negotiating a curve to his right, cannot see westbound traffic on Dorchester Avenue until that traffic is virtually within the intersection. The intersection is likewise "blind" for westbound traffic on Dorchester Avenue before reaching the intersection.

On the morning of the accident, Kelly, the driver of the tractor-trailer, had left Columbia, South Carolina, about five o'clock bound for Charleston, some 100 miles away, to pick up a load of bananas. He arrived in Charleston between 7:30 and 8:00 o'clock, loaded his truck and started the return trip to Columbia, proceeding north on Meeting Street Road. At about 10:30 A.M. he rounded the curve on Meeting Street Road and approached the intersection which has been described. It appears that this district was zoned for 35 miles per hour traffic. Kelly had made this trip many times and was familiar with the intersection and the speed limits there.

The McClures were in the Charleston vicinity after a twelve-year absence except for one short visit and were staying at a motel. There was testimony to the effect that the area had undergone a great change during their absence. As David Boatman testified, the fact that the traffic signal was not operating was not alarming since in Knoxville, Tennessee, where the four passengers resided, some of the traffic lights are not in operation after schools close for the summer months.

There was testimony to show that Mr. McClure applied his brakes prior to reaching the intersection and brought his vehicle almost to a stop; that from this position cars approaching on Dorchester Avenue from the opposite direction to the west of the intersection could

be seen traveling in an easterly direction, moving into the intersection and turning right although other vehicles at that point in the through lane or the northerly lane were not moving. Mr. McClure proceeded slowly into the intersection and again applied his brakes in an apparent effort to avoid collision with the tractor-trailer which, according to the testimony of certain witnesses, had entered the intersection after the McClure car was partly across and which, in the words of one witness, "came roaring out of no place." The vehicles collided at a point in the intersection almost directly under the suspended traffic control device. Photographs of the Oldsmobile, taken after the accident, show the terrific impact of the collision. Evidently the front end of the McClure car collided with the tractor at a point almost directly back of the tractor driver's cab. Other damage to the left rear portion of the McClure car was apparent. The force of the collision hurtled and spun the Oldsmobile into and through a brick wall or coping, causing it to land in the lot at the northeast corner of the intersection some distance from the point of impact. There was evidence to indicate that the McClure car had been spun around due to the truck's momentum and that the left rear of the car struck against the rear part of the tractor-trailer after the first contact. Mr. McClure was thrown clear of the car and was killed instantly. Mrs. McClure was thrown out of the automobile so that, after the vehicle came to rest, only her feet were still inside and up on the front seat. The McClure car was completely demolished and sold for junk.

An investigating officer testified that when he arrived on the scene the truck was parked and the rear of the trailer was from 120 to 125 feet beyond and north of the intersection. Other witnesses, including Kelly, fixed the rear of the trailer at a point nearer the intersection.

Mrs. McClure sustained personal injuries. According to the medical evidence, in addition to various and sundry

painful lacerations, bruises and sprains, her left cheek bone was fractured causing hemorrhages into the tissues and requiring many stitches. She was unconscious and after a stay in a hospital was removed in a station wagon to her home in Tennessee. After a period of approximately three weeks she returned to former employment at the direction of her physican who thought this might relieve her mental anxiety. She testified that she could not do her work properly. There was testimony to the effect that she suffered from dizziness, loss of memory, spells of nervousness and headaches; that she has never fully recovered from her injuries; that she sustained an ugly pigmented scar on her left cheek which, at the time of trial, was puffed out and was admitted to be a permanent defect.

As stated, there were conflicts in the testimony. Certain witnesses told of the roar of the truck as it came into the intersection, estimating its speed as 45 to 50 miles an hour. Kelly, the driver, and other witnesses testified that the truck was proceeding at a much slower rate. The surviving occupants of the Oldsmobile testified that the McClure car, prior to reaching the intersection, had been traveling at a speed of 10 to 15 miles an hour and came almost to a complete stop before entering the intersection. Mrs. Beckham, a stranger to the McClures and apparently a disinterested witness, was driving her own car on Dorchester Avenue about one and one-half or two car lengths behind the McClure car. She estimated her speed along Dorchester Avenue at about 25 miles an hour.

She had learned earlier in the day that the traffic lights on Dorchester Avenue were not operating. Concerning the McClure car, its approach to the intersection and the accident, she testified on cross-examination as shown below.[1]

David Boatman who, as stated, was a passenger in the rear seat of the McClure car, testified that the truck loomed up in front of them and just as Mr. McClure "hit" the brakes he hit the truck; that the truck was going through so fast Mr. McClure "didn't have a chance." Defendant Kelly testified on direct examination that he did not see the McClure car until the impact. However, on cross-examination he stated that while he was watching the light straight ahead to see if it was green, he saw the McClure car approaching from his right 15 to 20 feet away at 40 to 45 miles per hour, or at any rate, at a highly excessive speed. No other witness in the case testified that the McClure car was speeding. With reference to the speed of his tractor-trailer, Kelly testified that he could observe the traffic signal some little distance before he reached the intersection; that, as he drew nearer, he decreased speed to between 15 and 20 miles an hour because the signal light at the intersection was red; that he shifted into a lower gear as the green light appeared and applied power; that the lower gear permitted a speed no greater than 30 miles per hour; that as his cab was under the traffic light he heard the squeal of brakes; that he saw the McClure car after it hit and he then stopped his vehicle.

1. "Q. And you noticed as the Oldsmobile came up that it slowed but it did not come to any stop? A. I would say it was more stopped than it was going. I will put it that way. It was more of a standstill than it was going.
"Q. Well, did it ever come to a stop? A. They were there before I was.
"Q. But they were in full view of you? A. Yes. I saw the man hit his brakes twice.
"Q. Ma'm? A. Mr. McClure had his foot on the brakes twice and that is when I hit mine.

"Q. He had his foot on the brakes twice? A. That is right.
"Q. Now you said that you heard the truck coming? A. That is correct.
"Q. Before you saw it? A. Yes.
"Q. And when you heard the truck coming, you knew there was going to be an accident? A. Yes, I did.
    *    *    *    *    *
"Q. You knew there was going to be an accident, you said, because of what? A. Because the McClures were in the intersection. They were entering the intersection at the time. That is why I knew there was going to be an accident."

Following the presentation of all the evidence, defendants moved for directed verdicts in their favor, which motions were denied. The verdicts for the plaintiffs were determined upon conflicting evidence, not only as to the negligence of the truck driver but also as to the contributory negligence of Mr. McClure in the action for his unlawful death. (Pursuant to the court's ruling and direction, no issue of contributory negligence in the case of Mrs. McClure for her personal injuries was submitted to the jury.)

■ It is too well settled to warrant discussion that on a motion for a directed verdict or on motion for judgment *non obstante veredicto* based on such motion, the evidence must be considered in the light most favorable to the party against whom the directed verdict or the judgment n. o. v. is asked, that any conflict in evidence must be resolved in his favor and that every conclusion or inference that can be legitimately drawn therefrom in his behalf must be drawn.[2]

Applying the above stated legal principles, certain of the crucial facts here may be stated as follows:

The Oldsmobile driven by Mr. McClure was equipped with power brakes, in good working order. Both vehicles entered a "blind" intersection normally protected by traffic signals but which were not operating to control traffic on Dorchester Avenue. Truck driver Kelly was familiar with the area, the curve and the "blind" corner and knew the maximum speed limits at the place of the accident. Mr. McClure, a resident of Knoxville, Tennessee, back in the Charleston area after a prolonged absence (save for a short visit in 1958), was not generally familiar with the locality as it had changed greatly during his absence. He was a careful and cautious driver and when he slowed down for the intersection to almost a stop, he could see approaching traffic on Dorchester Avenue to the west of the intersection turning right into Meeting Street Road. Also, in his home city of Knoxville, certain traffic lights were customarily out during the summer months. Nevertheless, he approached with caution, brought his car to a virtual stop and proceeded cautiously into the intersection at a lawful rate of speed. He had actually entered the intersection for a distance of approximately 24 feet when the tractor-trailer, heavily laden, entered the intersection from around a curve, traveling at a fast rate considerably in excess of the limits fixed by law, and the collision occurred. The momentum of the truck spun the McClure car around and flung it against the rear of the truck and then through a brick coping into a neighboring yard. The tractor-trailer combination, 42 feet long, could not be brought to a stop until the rear of the trailer was 120 to 125 feet north of the intersection.

■■ Under these circumstances, the trial judge correctly rejected the defendants' contention that, as a matter of law, Mr. McClure must be held to have been contributorily negligent. There was ample evidence on the questions properly before the jury to support a finding that the truck driver was negligent and that such negligence was a proximate cause of the accident. Furthermore, whether Mr. McClure was negligent or whether he exercised ordinary and reasonable care under all the circumstances were questions to be submitted for jury determination under proper instructions from the court. As was said by Chief Judge Parker, speaking for this court in Burcham v. J. P. Stevens & Co., 209 F.2d 35, 38 (4th Cir. 1954):

"* * * Questions of negligence or contributory negligence are ordinarily questions of fact involving the application of the rule of the reasonably prudent man to the facts of the case, and they are not to be decided by applying 'rules of thumb' to the evidentiary facts and treating

2. Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350, 352 (4th Cir. 1941); Snead v. New York Central Railroad Company, 216 F.2d 169, 172 (4th Cir. 1954).

as conclusions of law what are in reality conclusions of fact. * * * "

▪ In Burcham, supra, 209 F.2d 35, 38–39, may be found also a statement of the following well established legal principles: There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court.

In Grooms v. Minute-Maid, 267 F.2d 541, 543 (4th Cir. 1959), this court said:

"'It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored.' Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 412, 88 L.Ed. 520. Also see Pierce v. Ford Motor Co., 4 Cir., 1951, 190 F.2d 910, and Doggett v. Atlantic Holding Corp., 4 Cir., 1956, 239 F.2d 156."

And at page 546:

" * * * It has been firmly established by the Supreme Court of South Carolina that the violation of applicable statutes governing the operation of motor vehicles upon the highway, including the prima facie speed limit fixed by Section 46–362 of the 1952 Code of Laws of South Carolina, is negligence per se, and whether such breach constitutes a proximate cause of the injury complained of is ordinarily a question for the jury. Padgett v. Colonial Wholesale Distributing Co., supra [232 S.C. 593, 103 S.E.2d 265 (1958)], and Chapman v. Associated Transport, Inc., 1951, 218 S.C. 554, 63 S.E.2d 465."

▪ The District Court charged the jury concerning the laws of South Carolina pertaining to speeds of motor vehicles on highways.[3] The violation of these statutes by the truck driver constituted negligence *per se* and it is implicit in the jury's verdict that such violation contributed as a proximate cause of the accident. See Chapman v. Associated Transport, Inc., 218 S.C. 554, 63 S.E.2d 465, 469 (1951).

3. 1952 Code of Laws of South Carolina
   "Article 6.
   *"Speed Restrictions.*
   "§ 46–361. General rule.
   "No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event speed shall be so controlled as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.
   "§ 46–362. Prima facie speed limits.
   "Where no special hazard exists that requires lower speed for compliance with § 46–361 the speed of any vehicle not in excess of the limits specified in this section or established as herein authorized shall be lawful, such limits established in this section being:
   "(1) Twenty-five miles per hour in any business district.
   "(2) Thirty-five miles per hour in any residence district; and
   "(3) Fifty-five miles per hour under other conditions.
   "Any speed in excess of such limits or limits established as herein otherwise authorized shall be prima facie evidence that the speed is not reasonable or prudent and that it is unlawful.
   "The prima facie speed limits set forth in this section may be altered as authorized in §§ 46–367 to 46–371."

■ By the laws of the State of South Carolina, the truck driver was required to yield the right-of-way to the McClure vehicle which was already lawfully in the intersection.[4] In Geiger v. Checker Cab Co., 229 S.C. 39, 91 S.E.2d 552 (1956), the jury found a verdict in favor of the husband when his wife died as the result of injuries received in an intersection accident between a taxicab and the car that she was driving. Eastbound traffic on the street on which she was driving was required to stop before entering the intersection. It further appeared that the taxi entered the intersection at a high rate of speed. In affirming the verdict the court held (91 S.E.2d 552, 554):

"* * * In approaching the intersection of Laurel street it was his duty to exercise due care notwithstanding his knowledge that traffic on Laurel was required to stop before crossing Gadsden. If, approaching that intersection, he was traveling at an unlawful rate of speed, or was not keeping a proper lookout, or if the Geiger car had already entered the intersection before the cab reached it,—and the evidence for the respondent is susceptible of such inferences,—it was for the jury, not the court, to determine whether or not such negligence proximately caused the collision. The credibility of witnesses is peculiarly within the province of the jury. Scurry v. International Paper Co., 227 S.C. 392, 88 S.E.2d 256."

### Errors Alleged in Support of Motions for New Trials

■ At the northwest corner of the intersection here involved was located a small barber shop. One McDowell, a witness called by the defendants, was looking out of the barber shop window and testified concerning the collision. He stated that a fellow barber, one Thomas, saw the McClure car approaching the intersection and exclaimed, "The dern fool in going to kill himself," or something of that nature. Upon objection the trial judge excluded that statement and instructed the jury to disregard it. Defendants contend that it was admissible as part of the res gestae. However, Thomas was also called as a witness for defendants and stated that he saw the truck "about" under the traffic signal, that he heard the wreck and that the truck went on across. At no point in his testimony did Thomas say that he saw the McClure car before the collision. We perceive no error in excluding the alleged statement of Thomas.

■■ Defendants next contend that the verdict of $20,000 in favor of Mrs. McClure for her injuries was excessive. In determining whether a verdict is excessive, we recognize the principle that the maximum amount which a jury may properly award as damages under the evidence in a personal injury case cannot be determined with any degree of certainty and must be largely a matter of judgment. If there is substantial evidence to sustain the verdict, it will not be disturbed.

In Dickson v. Inter-Carolinas Motor Bus Co., 161 S.C. 297, 159 S.E. 625, 626 (1931), the following language appears:

"A question as to the excessiveness of a verdict, where there is any evidence tending to support the same, is a matter for the determination of the trial judge in the exercise of his power and discretion, and when he refuses to disturb the verdict this court has no power to do so in the absence of a showing that there was an abuse of discretion in

4. 1952 Code of Laws of South Carolina "§ 46-306. Meaning of traffic-control signals.
    *     *     *     *     *
"(1) Green alone or 'Go' means that
"(a) Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn, but vehicular traffic, including vehicles turning right or left, shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time such signal is exhibited; * * *."

failing to grant a motion made for that purpose. * * * "

This quoted language was approved by this court in Pepsi-Cola Distributors of Charleston v. Barker, 4 Cir., 274 F.2d 372, 375 (1960). In the instant case there was evidence before the jury of Mrs. McClure's disability, her permanent injury and disfigurement, her pain and suffering. We cannot say that the District Judge abused his discretion in refusing to disturb the verdict.[5]

It is here urged that Mr. McClure was negligent, that his negligence was a proximate cause of the accident and that his negligence is to be imputed to Mrs. McClure on the theory that they were engaged in a joint and common enterprise. Mrs. McClure testified, without contradiction, as to the purpose of their trip on that fateful day: "Well we had planned to go into town and go out to where we used to live and then to visit some friends." Defendants' counsel sought unsuccessfully to elicit from her an admission that she, in some way, had some control over the operation of the car in which she was riding. Prior to the presentation of counsel's arguments to the jury, the trial judge ruled that there was no evidence of common enterprise as construed by the Supreme Court of South Carolina or of negligence on the part of Mrs. McClure. He told the jury:

"I charge you that in this State, the negligence, or the contributory negligence, of the driver of a motor vehicle cannot be imputed or charged to a party in the car, unless such party controlled the driver or had the right to do so."

In Hider v. Gelbach, 135 F. 2d 693 (4th Cir. 1943), this court had occasion to consider the precise question of law here presented. At page 696, citing with approval Funderburk v. Powell, 181 S.C. 412, 187 S.E. 742 (1936), and

Crapse v. Southern Ry. Co., 201 S.C. 176, 21 S.E.2d 737 (1942), Judge Dobie, speaking for the court, quoted from the Funderburk case as follows:

" 'The general rule is that in order to charge a passenger with the contributory negligence of the driver of the conveyance, *the passenger must have assumed toward the driver the relation of master or superior.* * * *

" 'A passenger cannot be said to be in possession or control of the vehicle in which he may be riding within this rule, merely because he gives directions or suggestions as to the route or place of destination. * * *

" 'The cases on the question of joint enterprise are numerous. They are almost wholly concerned with whether, admitting that the driver of an automobile and a person riding with him have a common purpose in making the trip, *further conditions exist from which it can be said to appear that the negligence of the driver should be imputed to the passenger.' "*

This court added: " 'Further conditions' are those which establish the relationship of principal and agent." Certainly, there is no evidence in the instant case to show a principal and agent relationship between Mr. and Mrs. McClure. They were simply out for a pleasure trip which fact, in itself, is insufficient to support defendants' contention that the jury should have been permitted to consider and determine contributory negligence on the part of Mrs. McClure. Furthermore, the trial judge submitted to the jury the question whether any negligence of Mr. McClure was a proximate cause of the accident. The jury found no such negligence. Before his negligence could be imputed to Mrs. McClure, it must be shown to exist.

---

5. For other cases in which the excessiveness of verdicts was considered, see: Haselden v. Atlantic Coast Line R. Co., 214 S.C. 410, 53 S.E.2d 60, certiorari denied, 338 U.S. 825, 70 S.Ct. 73, 94 L. Ed. 501 (1949); Jackson v. Solomon, 228 S.C. 225, 89 S.E.2d 436 (1955).

Next it is urged that the District Court erred in charging the jurors with respect to their duty to reach a verdict. After the court's charge had been delivered, defendants objected on the ground that the judge had not properly explained to the jury the right of each juror to form his own opinion and to adhere thereto according to his own conviction. The jury returned and the court, in a further charge, removed any question on that point to the admitted satisfaction of defense counsel. Whether a jury has been properly instructed is to be determined, not upon consideration of a single paragraph, sentence, phrase or word, but upon consideration of the charge as a whole. This principle is so fundamental and so well settled as to require no elaboration. We have examined the entire charge which, considered as a whole, fairly presented the issues to the jury.

Affirmed.